RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0218p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ANDREW WILLIAMS BANNISTER, deceased, by his Co-Administrators Ad Litem, Candace C. Bannister and Mark E. Bannister,

*Plaintiffs-Appellants,*

*v.*

No. 21-5732

KNOX COUNTY BOARD OF EDUCATION; KNOX COUNTY, TENNESSEE; KNOX COUNTY TENNESSEE SCHOOLS; RYAN J. SIEBE; KIMBERLY H. GRAY; ANTHONY B. NORRIS; ERIN A. ASHE; BRIAN A. HARTSELL,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:18-cv-00188—Travis Randall McDonough, District Judge.

Argued: March 16, 2022

Decided and Filed: September 21, 2022

Before: SILER, LARSEN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Hilary L. Magacs, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellants. David M. Sanders, KNOX COUNTY LAW DEPARTMENT, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Arthur F. Knight, III, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellants. David M. Sanders, KNOX COUNTY LAW DEPARTMENT, Knoxville, Tennessee, for Appellees.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  During his sophomore year of high school, Andrew ("Will") Bannister tragically committed suicide.  Will's parents, Candace and Mark Bannister, have sought to hold his school's administrators liable for allegedly imposing discriminatory discipline that they say led Will to take his life.  For years, however, their suit has failed to make it past the pleading stage.  The suit bounced back and forth between state court and federal court as their initial attorney disclaimed raising federal claims while their next attorney asserted claims under 42 U.S.C. § 1983 and Title IX of the Education Amendments Act of 1972.  The belated federal claims themselves have substantially evolved between the briefing in the district court (which dismissed them on statute-of-limitations grounds) and the briefing in this court.  For the most part, therefore, we find that the Bannisters have forfeited their current arguments that they timely filed these claims.  This case thus highlights the risks for counsel who do not develop a coherent legal theory at the outset of their case and who instead continuously adopt new arguments when problems emerge with their old ones.  That approach not only delays the case's outcome for their clients but also increases the chances that their clients will lose on something other than the merits.  We affirm.

I

This case reaches us from an order dismissing the Bannisters' complaint.  So we must accept the complaint's factual allegations as true (whether or not the Bannisters could prove those allegations at trial).  *See Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020).

The Bannisters lived with Will outside Knoxville, Tennessee.  Compl., R.36-1, PageID 534.  In middle school, Will began to style his red hair in unique ways and to wear unique clothing.  *Id.*, PageID 535.  He started to attend Farragut High School in the fall of 2015.  *Id.*, PageID 536.  His "appearance and dress became more unique" in high school.  *Id.*  Both his style and his friendships with gay students created "a perception that he was alternatively sexually oriented."  *Id.*, PageID 541.  Will was also perceived to be affiliated "with the LGBT movement"

due to his support for transgender students to use the bathrooms associated with their identified genders. *Id.*, PageID 542.

According to the Bannisters, high-school administrators targeted Will for discipline because of his appearance, perceived sexual orientation, and speech. *Id.* The Bannisters highlight two examples from Will's freshman year. In April 2016, students alerted a teacher that they saw a red-haired student with what they thought was a pill bottle. School administrators directed their suspicions toward Will. It turns out, however, that Will had a bottle of baby powder, not pills. Assistant Principal Anthony Norris suspended him for one day, even though school rules did not prohibit baby powder. *Id.*, PageID 538–39. A month later, a teacher left Will and other students unattended during a theater class. A yearbook staff-member invited Will and two other theater students to eat pizza. Will grabbed a pizza box, and the two other students ate the pizza. Seeing Will with the box, the yearbook teacher accused him of stealing. Norris imposed a two-day suspension on Will but did not discipline the other theater students. *Id.*, PageID 539–40.

The administration's alleged discrimination against Will continued into his sophomore year. In the fall of the 2016–2017 school year, Principal Ryan Siebe searched Will's locker due to what turned out to be an inaccurate "anonymous tip." *Id.*, PageID 543. Later in the first semester, a teacher sent Will to Principal Siebe's office for sleeping in class. *Id.* Although Will tried to explain that he had worked late the night before, Siebe raised concerns that Will was on illegal drugs because of his slurred, incoherent speech. *Id.*, PageID 543–44.

On December 8, a student reported seeing Will with pills. *Id.*, PageID 544. Will admitted to Principal Siebe that he had bought 30 capsules of an over-the-counter dietary supplement from another student. *Id.*, PageID 544–45. In response, Siebe immediately suspended Will and initiated proceedings for a long-term suspension. *Id.*, PageID 545–46. Siebe appointed another assistant principal, Kimberly Gray, as the hearing officer for Will's suspension hearing. *Id.*, PageID 548. She failed to hold the hearing within five days, as required by school policy. *Id.*, PageID 545–46, 568. In the meantime, Will passed a drug test and the pills tested negative for illegal substances. *Id.*, PageID 545, 548–49. Gray nevertheless imposed a 100-day suspension on Will. *Id.*, PageID 549. Yet administrators did not even investigate the student

who had sold him the pills. *Id.* Their continued singling out of Will caused him to suffer great anxiety. *Id.*, PageID 546, 551.

The Bannisters appealed the suspension to Brian Hartsell, the school district's "Disciplinary Hearing Authority." *Id.*, PageID 551. After another delay, Hartsell held the hearing in mid-January 2017. *Id.*, PageID 551–52. Before it began, he spoke privately ("ex parte") with Assistant Principals Norris and Gray. *Id.*, PageID 552–53. At the hearing, Will's attorney noted that school rules did not permit Will's long suspension for the possession of diet pills. *Id.*, PageID 554–55. But Hartsell later ruled that he saw no reason why the "principal's decision should be overturned." *Id.*, PageID 555. This ruling left Will further devastated. *Id.*, PageID 556.

The Bannisters next appealed to the director of schools. In February, after speaking with legal counsel, the director decided to reinstate Will immediately. *Id.*, PageID 556–57. The suspension had, however, already harmed Will. The school district had assigned him to an inadequate online night program. *Id.*, PageID 557–59. This program also had not provided a counselor who would have recognized Will's increasing anxiety and depression. *Id.*, PageID 558.

Will gladly returned to Farragut High School on March 20, a suitable breakpoint in the second semester. *Id.*, PageID 560–61. Assistant Principal Gray told the Bannisters that Will would have a "clean slate," but her promise allegedly proved illusory. *Id.*, PageID 560–61. On his first day back, Principal Siebe atypically showed up in two of his classes. *Id.*, PageID 561.

Soon after Will's return, his creative-writing teacher, Erin Ashe, asked the students to write a journal entry answering the following question: "Is Your Life A Comedy or A Tragedy?" *Id.*, PageID 564. According to the Bannisters, Will contemplated suicide in his journal entry:

> Probably a tragedy because I have many flaws that will eventually be the end of me. The tragedy that might be the end of me, like selfishness or other things like that. Ridin round bein selfish and not thinking of others. I'm scared for myself that I might do something actually harmful for others. Shout out my boy Lil Tracy, he up next. Lil Raven also gon make it. GBC gonna take over or at least half of. I really messed up. There's no way I'm gonna finish.

*Id.*, PageID 583–84.  Although Ashe had read and graded this assignment by April 6, nobody at the school informed the Bannisters that their son had expressed these thoughts.  *Id.*, PageID 564.

The Bannisters thus lacked this information when they took Will to see his doctor the following week.  *Id.*  His deteriorating mental state had led them to consider whether to adjust his anti-anxiety medication.  *Id.*, PageID 561, 564.

On April 16, Will lost points on another writing assignment because he had improperly formatted his draft.  *Id.*, PageID 562.  Yet Ashe had told the class about the correct formatting while Will had been suspended.  *Id.*  When complaining about this issue to his parents, Will expressed frustration with what he perceived to be the school's discrimination and asked if they could sue.  *Id.*

The next night, Will's father got home from work and spoke briefly with Will in their basement about his writing assignment.  *Id.*, PageID 563.  After Mr. Bannister spent a short time upstairs, he returned to the basement to ask Will a question.  *Id.*  He "found Will unconscious and bleeding on the basement floor from a self-inflicted gunshot wound."  *Id.*  Will died.  Two weeks later, on April 30, the Bannisters discovered his journal entry in his backpack.  *Id.*

On April 16, 2018, just under a year after Will's death, the Bannisters brought a state-court suit against a group of defendants that we will collectively call the "School District."  The Bannisters named Knox County, the Knox County Board of Education, Knox County Schools, Siebe (the principal of Farragut High School), Gray (the assistant principal), Norris (the other assistant principal), Ashe (Will's creative-writing teacher), and Hartsell (the school district's Disciplinary Hearing Authority).  They sought damages, a declaratory judgment, and injunctive relief.  Their complaint alleged that the School District had denied Will "administrative due process" during his suspension proceedings.  The complaint also alleged that the School District had violated its anti-harassment and suicide-prevention policies.  The Bannisters later added claims for negligent infliction of emotional distress under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205.

The School District removed the suit to federal court on the ground that the "due process" allegations raised federal claims.  The Bannisters sought to remand the suit to state court.  Their

attorney clarified that they alleged claims only under Tennessee law, including the Tennessee Constitution, and that the district court lacked jurisdiction of these state-law claims. The district court remanded the suit in October 2018.

The Bannisters' attorney let the suit languish for years. They eventually retained new counsel. This attorney believed that the claims under the Tennessee Constitution would fail because state law did not authorize a damages action for constitutional violations. He also believed that the claims under the Tennessee Governmental Tort Liability Act would fail because the Act carved out civil-rights claims from its waiver of governmental immunity. *See* Tenn. Code Ann. § 29-20-205(2). The attorney thus filed an amended complaint adding federal constitutional claims under 42 U.S.C. § 1983 and statutory claims under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

The School District removed the suit to federal court again. It then moved to dismiss the Bannisters' complaint. The district court granted this motion, dismissing the action with prejudice. *Bannister ex rel. Bannister v. Knox Cnty. Bd. of Educ.*, 2021 WL 2685193, at *7 (E.D. Tenn. June 30, 2021). The court dismissed the claims under the Tennessee Governmental Tort Liability Act because the Bannisters' lawyer conceded that the claims lacked merit. *Id.* at *4. It dismissed the federal claims on the ground that the applicable statute of limitations had run. *Id.* at *5–7. We review the court's decision de novo. *See Rudd*, 977 F.3d at 511.

II

The Bannisters raise three arguments on appeal. They assert that the district court wrongly found their § 1983 claims untimely by misconstruing their constitutional theory. They assert that the court wrongly found their Title IX claims untimely by using an incorrect accrual date and by failing to apply the "continuing violation" doctrine. And they assert that the court overlooked their requests for equitable relief under state law.

A. Constitutional Claims Under § 1983

Section 1983 allows plaintiffs to sue state actors who violate their constitutional rights. 42 U.S.C. § 1983. The section itself contains no time limits within which plaintiffs must seek

redress for constitutional wrongs, but a nearby provision allows courts to follow some laws from the forum state in § 1983 suits.  *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1161 (6th Cir. 2021); 42 U.S.C. § 1988(a).  The Supreme Court has thus held that § 1983 adopts the forum state's statute of limitations for personal-injury actions.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  The parties in this case agree that a Tennessee statute setting a one-year limitations period applies to the Bannisters' claims.  *See* Tenn. Code Ann. § 28-3-104(a)(1); *Dibrell*, 984 F.3d at 1161.

But the parties disagree over the date that this one-year limitations period began to run on those claims.  The Supreme Court has provided two rules to help answer this question.

Rule One: While Tennessee law determines the length of the limitations period, federal law determines the event that causes the one-year clock to begin to tick (that is, the "accrual date").  *Wallace*, 549 U.S. at 388.  The Supreme Court has twice suggested in this § 1983 context that the presumptive accrual rule starts the running of a limitations period on the first day that a plaintiff may sue on a claim, which occurs once the plaintiff has "a complete and present cause of action[.]"  *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)); *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019).  We have, by contrast, applied a "discovery rule" to § 1983 claims.  *See, e.g.*, *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015).  This rule delays the start of the limitations period until a plaintiff learns of (or should have learned of) the injury and the party who caused it—even if all of the claim's required legal elements had come into existence before that point.  *See id.*; *see also Snyder-Hill v. Ohio State Univ.*, __ F.4th __, 2022 WL 4233750, at *10 (6th Cir. Sept. 14, 2022).  We recently attempted to reconcile these cases on the ground that *Wallace* and *McDonough* did not discuss the discovery rule and so should not be read to have rejected it for § 1983 claims.  *See Synder-Hill*, 2022 WL 4233750, at *10.  But that case involved Title IX and so could not have authoritatively resolved the tension in this distinct § 1983 context. We need not resolve this tension either because the difference between these two accrual rules makes no difference to our outcome.  *Cf. Dibrell*, 984 F.3d at 1162.

Rule Two: Before deciding on the specific requirements for a § 1983 claim, we must "identify the specific constitutional right" that the plaintiff has invoked.  *Manuel v. City of Joliet*,

137 S. Ct. 911, 920 (2017) (citation omitted). This "threshold inquiry" has importance in this statute-of-limitations context too. *Id.* We may choose the statute-of-limitations rules for a specific § 1983 claim only after looking to the common-law principles governing the tort that is "most analogous" to the alleged constitutional violation. *Id.*; *see McDonough*, 139 S. Ct. at 2156.

Two cases from the Supreme Court demonstrate this approach. In the first case, a plaintiff alleged that officers violated the Fourth Amendment when they arrested him without legal process (a warrant). *Wallace*, 549 U.S. at 387 & n.1, 389. The Court identified false imprisonment as the tort most analogous to this unreasonable-seizure claim. *Id.* at 388. It then explained that a "distinctive" accrual rule applied to false-imprisonment claims at common law. *Id.* at 389. Even though the plaintiff had a complete cause of action (and could have sued) on the first day of an unlawful detention, the limitations period did not begin to run until this unlawful detention came to an end—either through the plaintiff's release or through the initiation of legal process. *Id.* at 389–90 & 390 n.3. *Wallace* applied this false-imprisonment rule to the unreasonable-seizure claim. *Id.* at 390. It thus holds that a special accrual rule can apply to a § 1983 claim if the rule applies to the most analogous tort.

In the second case, a plaintiff alleged that an officer violated due process by introducing false evidence in the plaintiff's criminal case. *McDonough*, 139 S. Ct. at 2155. The Court identified malicious prosecution as the tort most analogous to this fabricated-evidence claim. *Id.* at 2156. At common law, malicious prosecution required a plaintiff to prove that the underlying criminal case had terminated in the plaintiff's favor. *See id.* The limitations period for this due-process claim thus began to run only on this date (when the case ended in the plaintiff's favor), not the earlier date when the officer used the false evidence. *Id.* at 2156–58. *McDonough* thus holds that, when a § 1983 claim adopts an analogous tort's legal elements, those elements can control whether a plaintiff has a "complete" cause of action. *Wallace*, 549 U.S. at 388 (citation omitted); *see Heck v. Humphrey*, 512 U.S. 477, 489–90 (1994).

This approach creates a problem for this case. The parties' briefing in the district court ignored the "threshold inquiry" for choosing the accrual rules that govern the Bannisters' § 1983 claims. *Manuel*, 137 S. Ct. at 920. Neither side identified the specific constitutional right at

issue.  When the School District moved to dismiss the § 1983 claims as time-barred, it did not characterize the complaint as invoking a particular constitutional theory.  Mot., R.42, PageID 793–55.  Rather, it argued that the Bannisters did not timely file their claims on April 16, 2018, because the School District's challenged acts all occurred before April 16, 2017.  *Id.*  The School District thus assumed that its *acts* triggered the limitations period for *every* § 1983 claim.  In response, the Bannisters also failed to identify the constitutional rights on which they relied.  Resp., R.44, PageID 810–13.  They instead argued that their (unidentified) claims accrued either upon Will's suicide (on April 17, 2017) or later when they learned of his concerning journal entry (on April 30).  *Id.*

The parties' oversight could affect the proper resolution of this statute-of-limitations issue.  The Bannisters' complaint vaguely indicated that the School Districts' "acts and omissions" violated Will's "federal constitutional rights" without identifying any specific right.  Compl., R.36-1, PageID 585.  While this type of complaint might not represent the best of legal strategies, *cf.* 5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1219, at 325 (4th ed. 2021), it does not conflict with modern pleading rules.  Those rules required the Bannisters to plead only factual allegations plausibly setting forth a claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  They did not need to identify the "precise legal theor[ies]" on which they relied.  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011); *Dibrell*, 984 F.3d at 1160.  And their factual allegations about the events in question could be read to raise different constitutional theories implicating different dates for when the claim came into existence.

On the one hand, the complaint's factual allegations could be read (as the district court read them) to assert a *procedural*-due-process claim tied to Will's suspension.  *Bannister*, 2021 WL 2685193, at *5–6.  (Will's state-law right to attend school likely counted as a due-process property interest under Supreme Court precedent.  *See* Tenn. Code Ann. § 49-6-3001; *Goss v. Lopez*, 419 U.S. 565, 572–76 (1975).)  The complaint repeatedly attacked Will's suspension proceedings as violating "administrative due process."  Compl., R.36-1, PageID 565, 572, 574, 576.  To list two examples, it alleged that Will did not receive timely hearings and that Assistant Principal Gray was not an "independent" adjudicator.  *Id.*, PageID 565–68, 577.

What is the proper accrual date for this claim?  Perhaps Will's suspension proceedings look like an administrative "prosecution," which might point to malicious prosecution as the "most analogous tort."  *Manuel*, 137 S. Ct. at 920.  Under this view, the Bannisters would not have had a "complete" claim until those proceedings ended in Will's favor (which occurred, if at all, in February 2017 when he was reinstated).  *See McDonough*, 139 S. Ct. at 2156.  If the claim included this favorable-termination element, the limitations period could have started running no earlier than this point.  *See id.* at 2156–58; *but cf. Bonelli v. Grand Canyon Univ.*, 28 F.4th 948, 952–55 (9th Cir. 2022).  Some of our cases, by contrast, treat the denial of process as a complete claim without identifying any common-law analogue.  *See, e.g.*, *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461–62 (6th Cir. 2016).  They have held that the limitations period began to run when the plaintiff learned of, or should have learned of, the alleged due-process problem (such as Gray's appointment as adjudicator), even if this problem occurs before the state reaches a "final decision" on the relevant issue (such as Will's suspension).  *See id.* at 461; *cf. Montanez v. Sec'y Pa. Dep't of Corrs.*, 773 F.3d 472, 480 (3d Cir. 2014).  Under any of these dates, though, the district court held that the Bannisters' claim would be untimely.  *Bannister*, 2021 WL 2685193, at *5.

On the other hand, the complaint's factual allegations could be read to raise a *substantive*-due-process claim tied to Will's suicide.  The complaint alleged that Will expressed suicidal thoughts in his journal entry and that the School District failed to inform the Bannisters.  On appeal, the Bannisters argue that this failure "shocks the conscience" and violates substantive due process.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *cf. Sanford v. Stiles*, 456 F.3d 298, 312–13 (3d Cir. 2006).  They add that the district court's opinion dismissing their suit overlooked this separate claim.

This substantive-due-process theory might give rise to different accrual rules, depending on the proper common-law analogy.  For some torts (such as trespass or battery), a plaintiff had a complete cause of action on the date of the defendant's wrongful action—whether or not the action immediately produced tangible damage.  *See Smith v. Travelpiece*, 31 F.4th 878, 886–87 (4th Cir. 2022); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1216 (10th Cir. 2014); Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of*

*Contract* 62–68 (1880).  If the Bannisters' substantive-due-process theory best resembles this type of tort, their claim might have come into existence on the date of the School District's allegedly wrongful act (the failure to disclose the journal entry).  Yet for other torts (such as negligence), "the wrong [was] only complete when damage [was] suffered," and so a plaintiff lacked a complete claim until the plaintiff incurred that damage.  Cooley, *supra*, at 67–68; *see Everly v. Everly*, 958 F.3d 442, 463 (6th Cir. 2020) (Murphy, J., concurring) (citing cases).  If the Bannisters' substantive-due-process theory best resembles this type of tort, the claim might not have come into existence until the date of their injury (Will's tragic suicide).

Ultimately, though, we need not decide the specific accrual rules that apply to any of these due-process theories.  Through their conduct (or, more accurately, their attorneys' conduct), the Bannisters have waived their procedural-due-process theory and forfeited their substantive-due-process theory.  As many courts have recognized, the terms "waiver" and "forfeiture" are often (wrongly) used interchangeably.  *See United States v. Montgomery*, 998 F.3d 693, 696 (6th Cir. 2021); *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011) (Gorsuch, J.).  This case well illustrates the distinction between them.

Start with the Bannisters' waiver.  A waiver occurs when a party intentionally abandons a known right.  *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017) (civil setting); *United States v. Olano*, 507 U.S. 725, 733 (1993) (criminal setting).  Although the requirements for a valid waiver vary depending on the context, *see New York v. Hill*, 528 U.S. 110, 114 (2000), we have generally held that a litigant waives a legal claim by initially raising the claim and then explicitly abandoning it later, *see, e.g.*, *United States v. Denkins*, 367 F.3d 537, 543–44 (6th Cir. 2004).  In both criminal and civil contexts, courts refuse to consider this type of intentionally jettisoned argument.  *See United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022); *Montgomery*, 998 F.3d at 697; *see also, e.g.*, *Reinard v. Crown Equip. Corp.*, 983 F.3d 1064, 1069 (8th Cir. 2020); *Henry v. Hulett*, 969 F.3d 769, 785–86 (7th Cir. 2020) (en banc); *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018); *Richison*, 634 F.3d at 1127.

Under this law, we need not consider the timeliness of the Bannisters' procedural-due-process claim.  On appeal, they intentionally abandoned the claim (which they obviously knew of).  *See Denkins*, 367 F.3d at 543–44.  Their reply brief clarified that they "do not argue" that

the district court wrongly dismissed the claim.  Reply Br. 1.  This statement represents a classic waiver.

Turn to the Bannisters' forfeiture.  A forfeiture occurs when a party fails to timely assert a claim, even if the party does so unintentionally (say, because the party failed to think of the claim until too late).  *See Montgomery*, 998 F.3d at 698.  Perhaps most commonly, appellate courts hold that a party has forfeited an argument when the party belatedly asserts it on appeal after having failed to raise it in the district court.  *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021); *Armstrong v. City of Melvindale*, 432 F.3d 695, 699–700 (6th Cir. 2006).  In short, the difference between waiver and forfeiture is the difference between intent and neglect.  *See Richison*, 634 F.3d at 1128.

In "exceptional" situations, courts have discretion to consider negligently forfeited (as opposed to intentionally waived) arguments.  *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) (citation omitted).  In a criminal case, an appellant may prevail on a forfeited argument not presented to the district court if the party can meet the well-known plain-error test growing out of Federal Rule of Criminal Procedure 52(b).  *See Montgomery*, 998 F.3d at 698.  In a civil case, no similar plain-error federal rule exists except in specific situations.  *See* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2472, at 26–28 (3d ed. 2008); Fed. R. Civ. P. 51(d)(2); Fed. R. Evid. 103(e).  But it is "well established" that courts may review forfeited arguments in the civil context too.  9B Wright & Miller, *supra*, at 28. Some courts have held that a litigant must meet a similar (yet more demanding) plain-error test. *See C.B. v. City of Sonora*, 769 F.3d 1005, 1017–18 (9th Cir. 2014) (en banc).  Others apply the same test.  *See Richison*, 634 F.3d at 1128–29; *Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1123 & n.3 (5th Cir. 1997).  For our part, we have yet to go beyond generic statements, noting that we may consider forfeited claims in civil cases in "exceptional" circumstances or when a "plain miscarriage of justice" would otherwise result.  *Redbubble*, 989 F.3d at 445 (citation omitted).

These rules doom the Bannisters' substantive-due-process claim.  In their appellate brief, they spend pages identifying this theory, citing relevant legal authorities, explaining why it applies to the complaint's factual allegations, and arguing that it is timely.  But this legal analysis

was nowhere to be found in any document that the Bannisters filed in the district court. It thus comes too late. *See Armstrong*, 432 F.3d at 699–700. While the Bannisters did not need to identify this theory in their complaint, *see Skinner*, 562 U.S. at 530, they could not sit idly by when the School District moved to dismiss that complaint on statute-of-limitations grounds. If they believed that they had timely filed their claim under this theory, they should have explained it in their response to the School District's motion to dismiss. They could not raise it for the first time on appeal and expect us to consider it de novo. *See, e.g.*, *Moran Vega v. Cruz Burgos*, 537 F.3d 14, 20–21 (1st Cir. 2008); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995); *cf. Dibrell*, 984 F.3d at 1160; *Doe v. Miami Univ.*, 882 F.3d 579, 594–95 (6th Cir. 2018).

Any other forfeiture rule would force district courts to travel far outside their neutral-decisionmaking lanes. To overturn a district court's decision based on a theory that a litigant did not present would compel the district court to "invent" theories for the litigant, something that the Supreme Court generally discourages. *Stransky*, 51 F.3d at 1335; *see United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Here, for example, the district court explained that the Bannisters did not argue that the School District's failure to notify them of Will's alleged suicidal thoughts violated a constitutional right. They argued only that this omission violated state law and the School District's policies. *Bannister*, 2021 WL 2685193, at *5 n.6. Should the district court have disregarded the Bannisters' arguments and invoked this substantive-due-process claim on its own? We should not require district judges to be legal alchemists, turning one claim into another, to avoid reversal on appeal.

When responding to questions at oral argument as to why the Bannisters had not forfeited this substantive-due-process claim, their counsel directed us to a footnote in their response to the motion to dismiss. In this footnote, the Bannisters stated that "the injury asserted in both [the § 1983 and Title IX] counts is the suicide." Resp., R.44-1, PageID 810 n.6. Yet this footnote did not identify the constitutional right on which the Bannisters relied. And no reasonable district court would have interpreted this sentence to be impliedly articulating a substantive-due-process theory. The Bannisters thus forfeited that theory. *See Richison*, 634 F.3d at 1127. Although we may consider forfeited claims in exceptional situations, the Bannisters have not shown any exceptional reason for us to consider the claim here. So we will not do so.

B.  Statutory Claims under Title IX

Title IX generally bars schools that receive federal funds from discriminating against students based on their sex: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  The statute does not include an express cause of action that allows students to sue for violations of this ban, but the Supreme Court created an implied right of action that permits students to seek damages. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).  Here, the Bannisters argue that the School District discriminated against Will "on the basis of [his] sex" because it took various actions against him due to his failure to conform to gender stereotypes.  *Cf. Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284–85 (6th Cir. 2017).

The district court rejected their Title IX claims on timeliness grounds.  *Bannister*, 2021 WL 2685193, at *7.  Given that Title IX does not include an explicit provision authorizing students to sue, it should come as no surprise that it also does not include an explicit provision identifying the time in which they must do so.  We have nevertheless held that Title IX (like § 1983) adopts the forum state's statute of limitations for personal-injury actions.  *See Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *see also King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015); *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1134–36 (9th Cir. 2006); *Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004).  The parties again agree that a Tennessee statute setting a one-year limitations period applies to the Bannisters' Title IX claims.  *See* Tenn. Code Ann. § 28-3-104(a)(1); *Lillard*, 76 F.3d at 729.

But they also again disagree over when this one-year limitations period began to run on those claims.  The School District asks us to adopt the district court's view.  It held that the statute of limitations barred the Bannisters' clams because they did not allege that any school agent took any act of "harassment or discrimination" against Will within one year of the date that they sued.  *Bannister*, 2021 WL 2685193, at *7.  The court thus held that Title IX's limitations period starts to run on the date of an allegedly discriminatory action.  *See id.*

The Bannisters offer two theories as to why the district court erred.  We reject each theory for a different reason—the first on a merits ground and the second on a forfeiture ground.

1. *Failure-to-Disclose Theory*. The Bannisters initially argue that their complaint alleged that Ashe, Will's teacher, engaged in sex discrimination by ignoring his journal entry's suicidal thoughts because of Will's failure to conform to gender stereotypes.  Assuming the validity of this Title IX theory, when would the one-year statute of limitations have started running?  The date that Ashe learned of and failed to disclose the concerning journal entry (April 6, 2017)?  The date that Will committed suicide (April 17)?  Or the date that his parents discovered the entry (April 30)?  Under the first date, the Bannisters would not have filed a timely claim.  Under the second two, though, they might have.

Circuit courts have adopted different approaches to the accrual rules for Title IX claims.  Like the Supreme Court in the § 1983 context, the Tenth Circuit has suggested that the limitations period commences on the date that the plaintiff could first "file" a Title IX "suit" and "obtain relief"—that is, the date "when the plaintiff has a complete and present cause of action." *Varnell*, 756 F.3d at 1215, 1217 (quoting *Wallace*, 549 U.S. at 388).  (Another court has applied a similar test by incorporating the forum state's accrual law, *see M.H.D. v. Westminster Schs.*, 172 F.3d 797, 801, 803–06 (11th Cir. 1999), but the Supreme Court has since clarified that federal law does not look to state law to determine a federal statute's accrual date, *see Wallace*, 549 U.S. at 388.)  Under this suggested approach, a statute of limitations can begin to run even before a plaintiff learns of the "facts giving rise to [the] claim," *El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 635–36 (6th Cir. 2022), or of the full injury from the defendant's conduct, *Varnell*, 756 F.3d at 1216.  If this rule applied, then, the Bannisters' claim—to the extent it was viable—presumably accrued over a year before they sued when Ashe took the action that "subjected" Will to "discrimination" (failing to notify his parents of his journal entry). 20 U.S.C. § 1681(a).

That said, several other courts have applied the "discovery rule" in this Title IX context (like they have done in the § 1983 context).  This rule, as noted, delays the start of the limitations period from the date that a plaintiff could sue to the date that the plaintiff knew of, or should have known of, certain facts related to the injury.  *See Moore v. Temple Univ.*, 674 F. App'x 239,

241 (3d Cir. 2017) (per curiam); *King-White*, 803 F.3d at 762; *Stanley*, 433 F.3d at 1136.  We recently joined this approach.  *See Snyder-Hill*, 2022 WL 4233750, at *7–10.  And the Bannisters' claim might be timely under this rule because the statute of limitations potentially would not have begun to run until they learned of Will's journal entry.

In the end, though, we opt to avoid these statute-of-limitations issues.  We may affirm the district court on any ground supported by the record.  *See Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786 (6th Cir. 2016).  And two restrictions on the scope of Title IX relief show that the Bannisters have not pleaded a required element of their claim (which makes it difficult, if not impossible, to determine the precise date on which they had a "complete and present cause of action" for purposes of the statute of limitations).  *Varnell*, 756 F.3d at 1215, 1217 (citation omitted).  As for the first restriction, Title IX permits the Bannisters to sue only the recipient of federal funds (Knox County Schools), not the employees of this recipient (such as Ashe) who allegedly engaged in the discriminatory conduct.  *See Bose v. Bea*, 947 F.3d 983, 988–89 (6th Cir. 2020); *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999); *see also Snyder-Hill*, 2022 WL 4233750, at *11.  As for the second, Title IX bars the Bannisters from holding Knox County Schools liable for any discriminatory acts of Ashe under a "respondeat superior" theory.  *Gebser*, 524 U.S. at 285.  A plaintiff instead may hold a funding recipient liable only if, as relevant here, a school official who has the power to take corrective action has "actual knowledge" of a school employee's discrimination.  *Id.* at 290; *see Bose*, 947 F.3d at 989–91.

In this case, however, the Bannisters alleged no facts showing that any of the Farragut High School administrators had "actual knowledge" of Will's journal entry or of Ashe's failure to share it with his parents.  *Gebser*, 524 U.S. at 290.  To be sure, the complaint fairly alleges that Ashe read this entry and that she did not tell the Bannisters about it.  Compl., R.36-1, PageID 563–64.  But the complaint does not allege that Ashe alerted anyone else about Will's journal entry, and it does not plead any facts suggesting that the administrators came across the entry through other means.  Indeed, the complaint alleges the opposite.  It specifically asserts that Ashe did *not* alert Principal Siebe about the journal entry and that she broke the school district's policy by her failure to do so.  *Id.*, PageID 583–84.  Because the Bannisters cannot hold Knox

County Schools vicariously liable for Ashe's alleged misconduct, they have failed to plausibly plead all of the elements of this specific Title IX claim. *See Gebser*, 524 U.S. at 285, 290.

2. *Continuing-Violation Theory*. The Bannisters' complaint also alleged that Knox County administrators (not just Ashe) engaged in other discriminatory actions, including those surrounding Will's suspensions. On appeal, they argue that this repeated discriminatory conduct created a "hostile school environment" for Will. This ongoing-harassment theory, the Bannisters continue, triggers the Supreme Court's "continuing violation" doctrine. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112, 115–21 (2002). That doctrine allegedly renders their suit timely with respect to all of the purportedly harassing actions, including those actions that happened well over a year before the Bannisters sued.

The continuing-violation doctrine arose from the employment-discrimination protections in Title VII of the Civil Rights Act of 1964. Employees sometimes allege not that they suffered a tangible employment injury (such as a firing or demotion), but that their workplace was so riddled with racial or sexual abuse that it affected the "terms" or "conditions" of their employment. 42 U.S.C. § 2000e-2(a)(1); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Under this theory, an isolated incident (such as a single sexist or racist comment) might not suffice to violate Title VII; rather, the abuse typically must continue over a sufficient period. *See Morgan*, 536 U.S. at 115. But how should a court decide when this type of ongoing claim accrues? The Court held that a plaintiff has filed a timely suit for *all* of the acts that make up the hostile work environment (including those that would fall outside the limitations period) as long as the suit is timely with respect to at least *one* of those acts. *Id.* at 118.

We have yet to extend this continuing-violation doctrine to Title IX, and other courts have split on whether to do so. *See Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 566 (3d Cir. 2017); *see also Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583–84, 584 n.2 (5th Cir. 2020). Even if we adopted this theory, the Bannisters might run into trouble in attempting to prove it. In the Title VII context, the Supreme Court has made clear that the doctrine cannot render timely a discrete act of discrimination (such as a termination) that is cognizable in its own right apart from any hostile work environment. *See Morgan*, 536 U.S. at 111–13. And the various suspensions that the Bannisters challenge here might resemble such discrete acts. *See Doe*, 850

F.3d at 566. The Supreme Court has also made clear that the doctrine applies only if at least one harassing act occurred within the relevant limitations period. *See Morgan*, 536 U.S. at 118. And the Bannisters point to no discriminatory act within one year of their suit. *Cf. Stanley*, 433 F.3d at 1137.

Regardless, we need not decide whether the continuing-violation doctrine applies to Title IX claims or whether the Bannisters adequately invoked it here. They forfeited this theory because they did not develop it in the district court. *See Armstrong*, 432 F.3d at 699–700. In their briefing below, they cited the theory only in an effort to save their § 1983 claims. As the district court explained, they did not raise it when offering reasons why they timely filed their Title IX claims. *See Bannister*, 2021 WL 2685193, at *7 n.7. And they again do not provide any basis for us to overlook this forfeiture. *See Redbubble*, 989 F.3d at 445. So we decline to consider this continuing-violation theory on appeal.

## C. The State-Law Claims for Equitable Relief

This conclusion leaves the Bannisters' argument that the district court overlooked their requests for declaratory and injunctive relief under state law. To resolve this claim, we must set the stage with some procedural history. In the district court, the School District moved to dismiss the Bannisters' "state law claims"—not just their state-law claims for damages—under the Tennessee Governmental Tort Liability Act. Mot., R.42, PageID 789. This Act establishes the rule that "all governmental entities shall be immune from suit" but goes on to list various exceptions to this immunity. Tenn. Code Ann. §§ 29-20-201, -20-205. In response, the Bannisters agreed to dismiss their claims "for damages" on the ground that no exception to immunity applied to their civil-rights suit. Resp., R.44-1, PageID 804; *see* Tenn. Code Ann. § 29-20-205(2). But the Bannisters said nothing about their claims for declaratory and injunctive relief. So the district court summarily granted the School District's motion to dismiss all of the state-law claims, reasoning that the Bannisters had consented to the dismissal. *Bannister*, 2021 WL 2685193, at *4.

The Bannisters now assert that the district court overread their consent. They consented to the dismissal of only their "state law claims for damages," their argument goes, so the court

should not have dismissed their claims for equitable relief.  Resp., R.44-1, PageID 804.  They allege further that the Tennessee Governmental Tort Liability Act does not cover these equitable claims, citing a case about an equitable action to abate a nuisance.  Reply Br. 15 (citing *Riverland, LLC v. City of Jackson*, 2018 WL 5880935, at *12 (Tenn. Ct. App. Nov. 9, 2018)).

We find this argument forfeited too.  *Cf. Bose*, 947 F.3d at 992–93.  Although the School District's motion twice specifically mentioned the Bannisters' state-law claims for "damages," Mot., R.42, PageID 785, 789, the motion generally asked the district court to dismiss the "state law claims" without qualification, *id.* PageID 789.  In the motion's conclusion, the School District reiterated that the court should dismiss all of the complaint's claims.  *Id.*, PageID 796.  If, therefore, the Bannisters believed that the Act's immunity did not extend to their requests for equitable relief, their response to the motion to dismiss "would have been the time to raise" this argument.  *Bose*, 947 F.3d at 993.  Their failure to raise any argument that the Act does not cover their state-law equitable claims until this appeal—until their reply brief, no less—comes too late.  *See id.*

That conclusion leaves one loose end about our subject-matter jurisdiction.  The Supreme Court has made clear that we have a duty to ensure ourselves of jurisdiction on our own initiative before we reach the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–101 (1998).  And, apart from the Bannisters' forfeiture, it is not clear to us that the district court would have had jurisdiction over their requests for injunctive and declaratory relief.  Article III of the Constitution restricts the jurisdiction of the federal courts to "Cases" or "Controversies."  U.S. Const. art. III, § 2.  This restriction requires plaintiffs to prove the three well-known elements for standing: injury in fact, causation, and redressability.  *See Steel Co.*, 523 U.S. at 102–03.  And the plaintiffs must meet standing's elements for each remedy sought.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006); *Thompson v. Whitmer*, 2022 WL 168395, at *2 (6th Cir. Jan. 19, 2022).  So while a past injury might suffice for the Bannisters to request backward-looking relief (damages), an imminent future injury must exist to obtain the types of forward-looking equitable remedies that the Bannisters seek here.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983).  And nowhere in the Bannisters' complaint

do they plead that the School District has threatened them with the same types of harms that it allegedly inflicted on Will.

Be that as it may, we thankfully may avoid resolving this (unbriefed) standing question. The Supreme Court has also held that federal courts have flexibility when choosing between non-merits dismissals (such as the choice between personal-jurisdiction and subject-matter-jurisdiction dismissals). *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–88 (1999). Under this rule, courts have repeatedly noted that they may dismiss on immunity grounds before considering standing issues. *See Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 989 n.4 (8th Cir. 2022); *Meyers v. Oneida Tribe Indians of Wis.*, 836 F.3d 818, 821–23 (7th Cir. 2016); *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 850 n.2 (9th Cir. 2012). By holding that the Bannisters forfeited any challenge to the dismissal of their equitable claims under the Tennessee Governmental Tort Liability Act, we follow that path in this case by affirming on that immunity ground (which we have described as jurisdictional). *Cf. Blakely v. City of Clarksville*, 244 F. App'x 681, 683 (6th Cir. 2007) (citing *City of Lavergne v. S. Silver, Inc.*, 872 S.W.2d 687, 690 (Tenn. Ct. App. 1993)).

We affirm.