NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0168n.06

No. 21-4184

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| RICHARD "RIP" HALE, | ) | **FILED** |
| Plaintiff-Appellant, | ) | Apr 17, 2023 |
|  | ) | DEBORAH S. HUNT, Clerk |

RICHARD "RIP" HALE,

    Plaintiff-Appellant,

v.

MORGAN STANLEY SMITH BARNEY
LLC, dba Morgan Stanley Wealth
Management,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF
OHIO

OPINION

Before: SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Richard "Rip" Hale has made millions of dollars as a top financial advisor for Morgan Stanley Smith Barney LLC. For decades, Hale maintained an unblemished record with Morgan Stanley. But Morgan Stanley eventually reprimanded him for violating its policies and denied him membership in its "Chairman's Club." These actions led Hale to demand arbitration against Morgan Stanley. An arbitrator rejected all of Hale's claims, and the district court denied his motion to vacate the arbitrator's decision under the Federal Arbitration Act. That Act requires us to review the arbitrator's decision under some of the most deferential standards known to law. Hale cannot meet those standards. We thus affirm.

I

In 1984, Hale took a job as a financial advisor with Morgan Stanley. Final Award, R.1-3, PageID 35. At some point, he began to work in a Morgan Stanley office outside Dayton, Ohio.

*Id.*, PageID 38. While there, Hale rose to become one of Morgan Stanley's highest revenue generators for his territory. *Id.*, PageID 35. He received many awards, and Forbes Magazine put him on its list of the country's best wealth advisors. *Id.* Morgan Stanley paid Hale well for his efforts. In 2018, he earned $2.75 million. Post-Hr'g Br., R.1-4, PageID 54 n.10. During most of Hale's successful career, the company never disciplined him. Final Award, R.1-3, PageID 35.

Things changed in 2013. He spoke to the media about investment strategies without getting Morgan Stanley's approval. *Id.* This media communication violated company policy. *Id.* Hale's manager thus issued him a "Letter of Education." *Id.* But Hale refused to sign it. *Id.*

The next year, Hale spoke to a client about investing in an initial public offering during the offering's "pre-effective" or "quiet" period. *Id.*, PageID 36. This conduct also violated company policy. So a manager issued him a "Letter of Reprimand." *Id.* Hale claims that he never received this letter. *Id.* Yet this manager recalled discussing the letter with Hale. *Id.* Hale again refused to sign it. *Id.* The manager thus wrote "refused to sign" at the bottom of the letter. *Id.*

A third reprimand followed in 2016 for Hale's violation of three separate company policies. A manager had referred Hale to Morgan Stanley's "Special Investigations Unit" on the suspicion that Hale had been reinvesting his clients' dividend income without getting their preapproval. *Id.* Morgan Stanley assigned Dan Derechin of that unit to investigate. *Id.*

Apart from confirming Hale's violation of the reinvestment policy, Derechin discovered that Hale had violated two other policies. *Id.*, PageID 36–37. To begin with, Morgan Stanley required financial advisors to get approval for any "Outside Business Investments." *Id.*, PageID 36–37. Back in 1999, however, Hale had formed a partnership to facilitate his family's investments. *Id.*, PageID 37. He never disclosed these partnership investments. *Id.* According to Hale, his manager assured him in 1999 that he need not disclose the partnership's investments

2

if his wife served as its president. *Id.* In 2016, though, Morgan Stanley's policies required disclosure of, and approval for, any outside investments by advisors or their spouses. *Id.*

In addition, Hale's family partnership had invested in a company owned by one of Morgan Stanley's clients. *Id.*, PageID 38. Morgan Stanley's policies separately barred advisors like Hale from investing in entities controlled by clients. *Id.*

For these three fresh violations, Morgan Stanley issued Hale a second "Letter of Reprimand" in June 2016. *Id.* Hale agreed to accept Derechin's finding that he violated the reinvestment policy if the company added language to the letter implying that he had committed only a "technical violation." *Id.* But Hale refused to acknowledge any other wrongdoing or sign the unamended letter. *Id.*

A few months later, Derechin traveled to Dayton on unrelated matters. *Id.* Hale invited Derechin into his office. *Id.* In testimony during Hale's arbitration, Hale and Derechin "fiercely contested" what the two discussed. *Id.* Derechin asserted that Hale "berated" him about his investigation and accused him of ethical lapses. *Id.* Hale claimed that the conversation remained "friendly" throughout. *Id.*, PageID 39.

In late 2016 and early 2017, Derechin presented his findings about Hale to two Morgan Stanley committees. *Id.*, PageID 39–40. The "Heightened Supervision Committee" saw no need to supervise Hale more closely. *Id.*, PageID 40. It ordered only that he participate in a "Day of Education." *Id.* But the "Guardianship Committee" rescinded Hale's membership in Morgan Stanley's "Chairman's Club." The company uses that club to recognize certain high-performing advisors. *Id.* The committee made this decision based on several factors: the three disciplinary letters, Hale's refusal to accept responsibility for his actions, and his hostile attitude toward Derechin. *Id.* Hale "complained mightily" about missing out on the Chairman's Club. *Id.*

Upset by his perceived mistreatment, Hale demanded arbitration under the terms of his contract with Morgan Stanley. Demand, R.32-1, PageID 358. Hale's claims evolved over the course of the arbitration. He ultimately asserted state-law claims for negligence, defamation, and intentional infliction of emotional distress based on Derechin's allegedly improper investigation. Mot., R.31-1, PageID 282. Hale also asserted a claim that high-level Morgan Stanley officials breached their fiduciary duties to him by failing to meet with him to discuss the matter. *Id.*

After reading a New York Times article, Hale later sought to add a federal age-discrimination claim. Mot., R.32-4, PageID 445–53. This article asserted that Morgan Stanley allowed another top advisor in Portland, Oregon, to remain with the company despite knowing about domestic-violence allegations against him. *Id.*, PageID 445–46. A few days after the Times published its article, Morgan Stanley fired this advisor. *Id.*, PageID 449. Hale still took the article as proof that the firm had treated a younger employee better than him. *Id.*, PageID 452. Yet the governing arbitration rules did not allow a claimant like Hale to amend a complaint after the respondent had filed its answer. Guidebook, R.32-1, PageID 392. So the arbitrator found that Hale raised this federal age-discrimination claim too late. Newman Aff., R.38-1, PageID 723.

Eleven witnesses testified during the arbitration. *See Hale v. Morgan Stanley*, 571 F. Supp. 3d 872, 876 (S.D. Ohio 2021). The arbitrator then rejected all of Hale's state-law claims. Final Award, R.1-3, PageID 34–43. The arbitrator resolved the factual disputes against Hale. According to the arbitrator, Hale had committed the policy violations that Morgan Stanley accused him of. *Id.*, PageID 41. Despite Hale's claim that he had never seen the first "Letter of Reprimand," the arbitrator also found that Hale had been shown this letter and refused to sign it. *Id.*, PageID 41. The arbitrator next credited Derechin's testimony that Hale had berated him in Hale's office. *Id.*, PageID 39. These findings led the arbitrator to conclude that Hale had not been

"defamed nor was he the victim of intentional infliction of emotional distress." *Id.*, PageID 42. The findings also meant that Derechin's investigation had not been "negligent." *Id.* The arbitrator lastly described Hale's fiduciary-duty claim as "frivolous." *Id.*

Hale filed a motion in federal district court to vacate the arbitrator's decision under the Federal Arbitration Act, 9 U.S.C. § 10. He asserted that the district court had jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties were diverse. But the district court dismissed the case for lack of jurisdiction. It found that Hale had failed to show that the amount of the parties' controversy exceeded $75,000. We reversed. *Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996, 997–99 (6th Cir. 2020).

On remand, the district court denied Hale's motion to vacate on the merits. *See Hale*, 571 F. Supp. 3d at 879–87. Hale now appeals a second time.

II

On appeal, we must apply two different standards of review—one for the district court's decision and the other for the arbitrator's. We use garden-variety standards to review the district court's decision to deny Hale's motion to vacate. That is, we evaluate the district court's findings of fact under the deferential clear-error test and we review its legal conclusions under the non-deferential de novo standard. *See McGee v. Armstrong*, 941 F.3d 859, 867 (6th Cir. 2019); *Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 599 (6th Cir. 2016).

But we review the arbitrator's decision under what we have called "one of the narrowest standards of judicial review in all of American jurisprudence." *Samaan*, 835 F.3d at 600 (quoting *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008)). This narrow review springs from the Federal Arbitration Act. In 9 U.S.C. § 10(a), the Act identifies the four "exclusive" grounds on which a federal court may vacate an arbitrator's decision. *Hall St. Assocs., L.L.C. v. Mattel,*

*Inc.*, 552 U.S. 576, 578 (2008). Hale has relied on two of those grounds here. Appellant's Br. 12. The district court could have vacated his arbitrator's decision if the arbitrator was "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced[.]" 9 U.S.C. § 10(a)(3). And the court could have vacated that decision if Hale's arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Id.* § 10(a)(4).

Hale identifies five reasons why the district court erred in refusing to vacate the arbitrator's decision under § 10(a)(3) and (4). He is mistaken on all counts.

*First*, Hale argues that the district court used an overly deferential standard of review to evaluate the arbitrator's decision. Appellant's Br. 16–20. To the contrary, the district court properly recited the Federal Arbitration Act's standards. *See Hale*, 571 F. Supp. 3d at 879. The court then properly applied those standards to Hale's claimed errors. *See id.* at 879–80, 883–85.

If anything, the court applied a standard that was overly *generous* to Hale. It suggested that it could vacate the arbitrator's decision if the arbitrator acted in "manifest disregard of the law." *Id.* at 881 (citation omitted). But, as the court also recognized, *id.* at 881 n.3, the Federal Arbitration Act's text does not include this manifest-disregard test; courts "created" it as an "alternative" to the Act's grounds for vacating an arbitrator's decision. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995). Since then, however, the Supreme Court has held that the Act provides the "exclusive" grounds for vacatur. *Hall St.*, 552 U.S. at 586. So, although some of our unpublished cases have continued to apply the manifest-disregard test, we have not yet "firmly settled" whether it survives *Hall Street*. *See Schafer v. Multiband Corp.*, 551 F. App'x 814, 819 & n.1 (6th Cir. 2014). We need not do so in this case either. We

may simply assume that our manifest-disregard test remains valid. *See id.* at 818–19; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010).

Given the district court's reliance on a test that potentially expanded the scope of review, why does Hale think that it reviewed the arbitrator's decision too narrowly? He contends that the court should have reviewed the arbitrator's findings of fact for clear error. But he misreads the cases on which he relies. They describe our standard of review for the *district court's* findings of fact, not for the *arbitrator's*. *See Barrick Enters., Inc. v. Crescent Petroleum, Inc.*, 496 F. App'x 614, 616 (6th Cir. 2012). That standard of review is beside the point. Hale does not claim that the district court found any facts—let alone that it did so in a clearly erroneous manner. And the Federal Arbitration Act's text does not permit us to vacate the arbitrator's factual findings solely because we think those findings wrong or even clearly wrong. *See Wachovia Secs., Inc. v. Gangale*, 125 F. App'x 671, 677 (2005); *cf. United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). So Hale (not the district court) mistakenly articulates the standard of review.

*Second*, Hale suggests that the arbitrator manifestly disregarded the law by rejecting his age-discrimination claim as untimely. Appellant's Br. 20–24. Under the test that we assume applies, arbitrators act with manifest disregard of the law only if they refuse to apply a clear (and clearly applicable) legal rule. *Jaros*, 70 F.3d at 421; *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000). When a reasonable judge could "conceivably" reach the arbitrator's legal conclusion, a manifest-disregard challenge must fail even if we would have reached the opposite one. *Jaros*, 70 F.3d at 421. In other words, mere legal errors will not do. *Schafer*, 551 F. App'x at 820. An arbitrator's decision must "fly in the face" of obviously applicable law. *Jaros*, 70 F.3d at 421.

Hale argues that the arbitrator manifestly disregarded the law by rejecting his argument that "equitable tolling" saved his age-discrimination claim. His argument has two problems.

7

For one thing, Hale does not allege that the arbitrator denied his claim based on the 300-day filing deadline in the Age Discrimination in Employment Act. *See* 29 U.S.C. § 626(d)(1)(B). Rather, he alleges that the arbitrator relied on an arbitration rule that barred Hale from amending his claims after Morgan Stanley filed its answer. Newman Aff., R.38-1, PageID 723. Hale cites no cases applying equitable tolling to this sort of contractual mandate, which resembles a rule governing the amendments to pleadings more than a statute of limitations. *Cf.* Fed. R. Civ. P. 15(a)(2). Because Hale lacks "clearly established" law expanding equitable tolling in his requested fashion, the arbitrator could "conceivably" conclude that the doctrine did not apply. *Jaros*, 70 F.3d at 421.

For another thing, even if equitable tolling could apply, Hale does not identify any "clearly established" law that compelled the arbitrator to equitably toll his age-discrimination claim. *Id.* Hale argues that he did not know that he had an age-discrimination claim until he reviewed the news article about a Portland advisor. But our cases have analyzed five factors when deciding whether a plaintiff could rely on equitable tolling for a belatedly filed age-discrimination claim. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 500–01 (6th Cir. 2001). And Hale did not even attempt to fit his argument into these factors until his reply brief. So he has forfeited any reliance on them. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022). Unable to rely on the governing framework, he has not shown that the arbitrator's "application" of that framework would "fly in the face" of our equitable-tolling precedent. *Jaros*, 70 F.3d at 421.

*Third*, Hale argues that the arbitrator refused to credit his "wrongful discipline" claim. Appellant's Br. 24–25. But his operative pleading did not include a wrongful-discipline claim. Mot., R.31-1, PageID 282. Besides, this argument rests on his factual contention that he was not an at-will employee and that his contract gave him "just cause" protections from discipline. Yet the arbitrator found that he was an at-will employee and that his repeated policy violations gave

Morgan Stanley more than adequate cause to discipline him. Final Award, R.1-3, PageID 41–42. Hale offers no grounds on which we can review—let alone overturn—these factual findings under the Federal Arbitration Act. *See Wachovia Secs.*, 125 F. App'x at 677. The findings would doom any wrongful-discipline claim even if Hale had pleaded one.

*Fourth*, Hale argues that the arbitrator "exceeded [his] powers" under 9 U.S.C. § 10(a)(4) because he did not issue a "reasoned" decision when rejecting Hale's defamation and intentional-infliction-of-emotional-distress claims. Appellant's Br. 25–27. Yet the parties' contract mandated only "a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law[.]" Guidebook, R.32-1, PageID 393; *see Hale*, 571 F. Supp. 3d at 883–84. Other courts have attempted to articulate what a "reasoned" arbitration award requires. *See, e.g.*, *YPF S.A. v. Apache Overseas, Inc.*, 924 F.3d 815, 820 (5th Cir. 2019); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 844–45 (11th Cir. 2011). But we need not provide an authoritative definition here. The arbitrator's nearly ten-page opinion would satisfy any test. Final Award, R.1-3, PageID 34–43. That decision identified all of the arbitrator's essential factual findings—most notably, "that Hale committed the acts and omissions for which he received discipline." *Id.*, PageID 41. And it contained the arbitrator's conclusions of law—namely, that "Hale was not defamed nor was he the victim of intentional infliction of emotional distress" because he committed the relevant violations. *Id.*, PageID 42.

Although Hale would have preferred the arbitrator to provide more "detailed" legal analysis, *YPF*, 924 F.3d at 820, he does not explain how these two claims could have survived under the arbitrator's findings. As for Hale's intentional-infliction claim, the arbitrator found that Morgan Stanley conducted a "reasonable" investigation that resulted in "accurate" statements about Hale's misconduct. Final Award, R.1-3, PageID 42. In light of these findings, no person

9

could describe the company's conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Reamsnyder v. Jaskolski*, 462 N.E.2d 392, 394 (Ohio 1984) (quoting *Restatement (Second) of Torts* § 46 cmt. d (Am. L. Inst. 1965)). As for Hale's defamation claim, the arbitrator found that all of the negative statements about Hale were true. Final Award, R.1-3, PageID 42. And truth is a complete defense to a defamation claim. *See Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1083–84 (Ohio 1996).

*Fifth*, Hale asserts that the arbitrator wrongly rejected his claim that Morgan Stanley officials breached their fiduciary duty to him. Appellant's Br. 28. He cites a Delaware opinion for the proposition that Morgan Stanley board members owe a fiduciary duty to shareholders to monitor corporate activities. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968–70 (Del. Ch. 1996). According to Hale, this duty required Morgan Stanley officials to have "a 45-minute adult conversation" with him about the investigation of his policy violations. Appellant's Br. 28. But Hale did not bring a shareholder-derivative suit. He brought a suit challenging conduct taken against him as a Morgan Stanley employee. So even if Hale is a Morgan Stanley shareholder too, his complaint arises from his separate employment status. The arbitrator thus accurately described this claim as "frivolous." Final Award, R.1-3, PageID 42.

We affirm.