RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHARLES JONES, as personal representative of the
estate of Wade Jones,

           *Plaintiff-Appellee*,

    *v.*

KENT COUNTY, MICHIGAN, et al.,

           *Defendants*,

MELISSA FURNACE, CHAD RICHARD GOETTERMAN, and
JAMES AUGUST MOLLO, jointly and severally,

           *Defendants-Appellants*.

> No. 23-1866

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-00036—Hala Y. Jarbou, District Judge.

Argued: June 13, 2024

Decided and Filed: August 16, 2024

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brian J. Richtarcik, FOLEY, BARON, METZGER & JUIP, PLLC, Livonia, Michigan, for Appellants. Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRIGTON, P.C., Southfield, Michigan, for Appellee. **ON BRIEF:** Brian J. Richtarcik, Randall A. Juip, FOLEY, BARON, METZGER & JUIP, PLLC, Livonia, Michigan, for Appellants. Robert G. Kamenec, Jennifer G. Damico, FIEGER, FIEGER, KENNEY & HARRIGTON, P.C., Southfield, Michigan, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.　A jury found that nurses Melissa Furnace, Chad Goetterman, and James Mollo (collectively, the Defendants) were deliberately indifferent to Wade Jones's medical condition while Jones was incarcerated at the Kent County Correctional Facility (the Jail).　The jury also found that the Defendants' deliberate indifference was a proximate cause of Jones's subsequent death, and it awarded Jones's Estate $6.4 million in compensatory damages.

On appeal, the Defendants contend that the district court erred in denying their motion for judgment as a matter of law or, in the alternative, for a new trial.　They raise the following four arguments:　(1) that the jury's verdict was inconsistent, (2) that no reasonable jury could have found that the Defendants' deliberate indifference was a proximate cause of Jones's death, (3) that the Estate's counsel committed "contumacious conduct" when she cried while examining one of the Estate's witnesses, and (4) that a juror's alleged misconduct in failing to disclose his criminal history during voir dire should result in a new trial.

After reviewing the trial record and the applicable law, we conclude that all of the Defendants' arguments lack merit.　We therefore **AFFIRM** the judgment of the district court.

## I.  INTRODUCTION

### A.　Factual background

Starting on April 24, 2018, Jones was incarcerated for five days at the Jail after pleading guilty to retail fraud for stealing alcohol and golf balls.　Jones went into cardiac arrest around 7:39 a.m. on April 27 and, after being transferred to a hospital shortly afterwards, died a week later.　Various nurses saw and assessed Jones's condition during his time at the Jail.　The district court's opinion, which denied the Defendants' blanket request for summary judgment, lays out the timeline of key events in great detail.　*See Jones v. County of Kent*, 601 F. Supp. 3d 221,

231–42 (W.D. Mich. 2022).  For the sake of brevity, we will focus on the facts relevant to the three Defendants involved in this appeal.

### 1.      *Nurse Furnace*

Furnace was the "charge nurse" when Jones was admitted to the Jail on April 24, 2018. During the morning of April 26, after another nurse informed Furnace that Jones was suffering from alcohol withdrawal, Furnace consulted by phone with Nurse Practitioner Joanne Sherwood. Sherwood then ordered that Jones's vitals be checked every shift and that he receive Valium every eight hours, a daily dose of thiamine, and a daily multivitamin.  Furnace put Jones on the "alcohol-withdrawal protocol" and noted that Jones was experiencing hallucinations as a result of his withdrawal, but declined to order that Jones receive Valium immediately.  She instead instructed the other nurses to start giving Jones Valium seven hours later, during their regularly scheduled rounds, because "that's the schedule."

A nurse assessed Jones around 6:30 p.m. on April 26, and a different nurse assessed Jones again around 4:00 a.m. on April 27.  Both nurses determined that Jones's alcohol withdrawal was "severe," and the nurse who assessed Jones at 4:00 a.m. reported that Jones had refused his medication.  Furnace was informed of these updates, but did not change Jones's treatment or take any other action.

Around 5:30 a.m. on April 27, Furnace went to Jones's cell after an officer reported that Jones might be having a seizure.  Furnace testified that she did not believe that Jones had suffered a seizure, but noticed that he was "hallucinating and confused."  She also stated that she considered the possibility that Jones had low blood sugar and yet "rule[d] that out."  But Furnace (1) conceded that she never administered the "finger stick" test that is used to determine whether a person's blood sugar is abnormally low, and (2) was unable to explain how she "ruled out" that possibility.  Furnace also decided to transfer Jones to the Jail's infirmary rather than to the hospital.  But she did not prescribe any medical treatment for Jones in the infirmary, even though she was aware that the infirmary could give Jones intravenous fluids.

After Furnace made her decision not to send Jones to the hospital, she called Nurse Practitioner Sherwood for orders.  Sherwood agreed with Furnace's decision that Jones be

admitted to the infirmary. Furnace testified that she did not remember what she discussed with Sherwood during their phone call but, on Jones's medical records, the box indicating that Furnace had reviewed Jones's "medical administration record" with Sherwood was not checked off. And when asked about standard nursing practices both at the Jail and more generally, Furnace testified that a "nursing mantra that every nurse knows" is that if something is not "charted," then "it didn't happen." Sherwood, for her part, testified that she did not recall discussing Jones's "medical administration record" with Furnace.

### 2.      *Nurse Goetterman*

At 6:00 a.m. on April 27, 2018, Goetterman replaced Furnace as the "charge nurse." Furnace testified that she provided a "shift report" to Goetterman that explained everything that had happened that night, although she admitted that there was no evidence in Jones's medical records of a written shift report. Goetterman helped move Jones to the infirmary around 6:00 a.m., but did not take any further action to treat Jones or check on him, did not give Jones any intravenous fluids or transfer Jones to the hospital, and "simply observed Jones off and on for almost two hours while Jones fell and stumbled around in an observation cell by the infirmary." *Jones v. County of Kent*, No. 1:20-cv-36, 2023 WL 5444283, at *6 (W.D. Mich. Aug. 24, 2023). Goetterman testified that he did not assess Jones or measure Jones's vital signs because Furnace had done so at 5:30 a.m.

A video from the prison infirmary showed that Jones was sitting on the toilet and not moving at 7:39 a.m. on April 27. Ariel Nulty, a medical-records clerk, testified that she saw that Jones was "slumped over" and reported it to both Goetterman and Mollo. In denying the Defendants' motion for judgment as a matter of law or for a new trial, the district court noted that Goetterman and Mollo "did not respond immediately," and that "[v]ideo of the incident indicates that they waited at least four or five minutes before checking on Jones." *Jones*, 2023 WL 5444283, at *6. As the district court summarizes:

> After Goetterman and Mollo finally entered the cell to evaluate Jones, they determined that he did not have a pulse. Mollo then gave Jones chest compressions but neither of them attempted to give rescue breaths or oxygen for about seven minutes, even though a bag valve mask was available to supply oxygen. (*See id.*, PageID.7078, 8025.) Although Goetterman claimed that the bag

did not initially have a mask attached, the jury did not have to accept his testimony. An expert identified the bag valve mask in a video of the incident. (*Id.*, PageID.7078.) And the video shows that Goetterman and Mollo eventually applied a mask to Jones's face. Also, Goetterman testified that the bag valves usually came with masks. (*Id.*, PageID.8021.) And the video shows Goetterman attempting to connect the valve bag to an oxygen tank, which would make more sense if the valve bag already had a usable mask.

*Id.*

Jones's heart started beating again at some point after Goetterman and Mollo gave him oxygen, and he was transferred to the hospital shortly afterwards. He died a week later. An autopsy concluded that the cause of Jones's death was from "complications of chronic ethanol abuse" and noted damage to various vital organs, including "extensive necrosis" in Jones's brain.

### 3. *Nurse Mollo*

Mollo was one of the nurses on duty on April 26 and 27, 2018. Around 1:00 p.m. on April 26, Mollo conducted a "withdrawal check" on Jones. Mollo gave Jones the prescribed withdrawal medication, but he did not attempt to take Jones's vital signs.

Mollo assisted Furnace and later Goetterman in transferring Jones to the infirmary around 6:00 a.m. on April 27, and he was on duty while Jones was in the infirmary. Medical-records clerk Nulty testified that she also informed Mollo that she had seen Jones slumped over on the toilet. Like Goetterman, Mollo waited several minutes before checking on Jones. Mollo also worked with Goetterman to administer CPR to Jones, but similarly did not give Jones any rescue breaths or oxygen for more than seven minutes.

### B. Trial proceedings

Jones's Estate sued Kent County, various Jail officials, Corizon Health, Inc., and several nurses—including the Defendants—who worked for Corizon at the Jail. The only claims remaining at trial were a deliberate-indifference claim under 42 U.S.C. § 1983 and a professional-negligence claim under Michigan law. Following a 12-day trial, the jury rendered a $6.4 million verdict in favor of Jones's Estate on the deliberate-indifference claim. Questioning

during voir dire and the testimony of the Estate's expert witnesses are of key importance with regard to the issues on appeal.

### 1. *Voir dire*

During jury selection, defense counsel asked the following questions to the jurors as a group:

> Have any of you had a family member, and let's not—a close family member. We don't have to go to fifth cousins and sixth cousins that may have been incarcerated. Let's say first with Kent County jail? Any jails in the state of Michigan?
>
> How about been arrested and maybe put in jail for overnight or something like that?

One juror answered in the affirmative and explained that a nephew of his had been in prison for a "long time." Defense counsel then asked whether that nephew's incarceration had "anything to do with alcohol," to which the juror responded "no."

No other juror answered "yes" to the questions or discussed a family members' incarceration. Defense counsel did not ask any of the jurors about their own criminal history. The Defendants' argument on appeal concerns Juror #108's failure to disclose his own criminal background. But defense counsel failed to ask that question during voir dire.

### 2. *Expert witness testimony*

Various witnesses testified during the trial, including Jones's family members and all three of the Defendants. Other than the Defendants' testimony (the most relevant parts of which are summarized in the "Factual background" section above), the expert testimony of registered nurse Stephen Furman and cardiologist Dan Fintel are most pertinent to this appeal.

### a. *Nurse Furman*

Furman testified as the Estate's nursing expert. He stated that, after reviewing the Jail's video footage of Jones in his cell around 5:30 a.m. on April 27, 2018, he believed that Jones "was withdrawing from alcohol severely" and "should have been transported to the emergency department" of a hospital. When asked about the level of medical care that Jones received after

he arrived in the infirmary but before his cardiac arrest, Furman's answer was "none." He later elaborated on his opinion of Goetterman's conduct, stating as follows:

> A patient is transported to a higher level of care to be in close observation or one-to-one observation, and that's far from what [Jones] received. We can see that [Goetterman] doesn't look at Mr. Jones. Mr. Jones laid slumped over on the toilet not moving and [Goetterman] was not observing the patient as he was supposed to be doing.

Furman was also critical of the CPR that Goetterman and Mollo performed on Jones, noting that "[i]t was not performed as the American Heart Association requires chest compression—or basic CPR—to be performed on a patient in cardiac arrest." Furthermore, Furman stated that instead of waiting for seven minutes before giving Jones any oxygen during CPR, Goetterman should have "started giving [oxygen]" as soon as he received the oxygen-supplying valve mask.

### b.    Dr. Fintel

Fintel testified as the Estate's causation expert. He stated that Jones "died as a direct result of the most severe form of alcohol withdrawal syndrome, delirium tremens, and that prompt recognition of his condition, which should have resulted in transfer to [a hospital], would have saved his life." Fintel also opined that "had [Jones] received basic medical care, . . . he would have never experienced a cardiac arrest or, had it occurred, . . . he would have survived this event as virtually all patients with delirium tremens do."

Furthermore, Fintel discussed the impact of Goetterman's and Mollo's failure to give Jones oxygen during CPR. He explained that

> [t]here's the rule of 10s that for every one minute the chance of brain survival falls by 10 percent, so roughly by 10 minutes of no circulation there is substantial irreversible damage to the brain due to the cessation of oxygen delivery. . . . So, the lack of performing or resuscitating the patient by 10 minutes virtually guarantees that there will be no recovery of brain function.

On cross-examination, defense counsel asked Fintel whether he agreed that "[Jones's] condition [became] irreversible where death was certain to occur at 5:00 a.m. in the morning [of

April 27, 2018]?"  Fintel responded:  "Yes, we discussed that in my deposition in terms of when his condition at the jail was irreversible."

When asked further questions, however, about Jones's condition as of 5:00 a.m. on redirect examination, Fintel stated that "if [Jones] remained at the jail[,] his likelihood of survival was less than 50 percent because he was deteriorating so rapidly."  He also reiterated his belief that Jones would not have gone into cardiac arrest or died if he had been at the hospital at 5:00 a.m. on April 27.

**C.      Motion for judgment as a matter of law**

After Fintel's testimony, defense counsel moved for judgment as a matter of law on the professional-negligence claim against Furnace for her conduct after 5:00 a.m. on April 27, 2018. The district court concluded that, given Fintel's testimony that Jones's likelihood of survival was less than 50 percent as of 5:00 a.m., the Estate could not establish that Jones's death "more probably than not was proximately caused by the negligence of the defendant or defendants" as Michigan law requires.  *Jones v. County of Kent*, No. 1:20-cv-36, 2023 WL 5444283, at *4 (W.D. Mich. Aug. 24, 2023) (quoting Mich. Comp. Laws § 600.2912a(2)).  It therefore granted the Defendants' motion regarding the professional-negligence claim as it related to Furnace's post-5:00 a.m. conduct. *Id.*

Later, when discussing the jury instructions, the Estate agreed to limit the professional-negligence claim to the three Defendants' actions prior to 5:00 a.m. on April 27 (the pre-5:00 a.m. conduct).  Defense counsel then sought to similarly limit the deliberate-indifference claim to the pre-5:00 a.m. conduct, arguing that Jones could not prove proximate causation.  The Estate's counsel argued that defense counsel's request was effectively a motion for a directed verdict.  On this point the district court agreed with the Estate, and it denied the motion.  The court concluded that causation with regard to the deliberate-indifference claim was a question of fact for the jury.

After deliberating for several days, the jury found that (1) all three Defendants acted with deliberate indifference to a serious risk of harm to Jones, and (2) their deliberate indifference was a proximate cause of Jones's death.  It also found that only Furnace was professionally negligent

prior to 5:00 a.m. on April 27, 2018, but that her negligence was not what caused Jones to die. The jury next awarded Jones's estate $6.4 million in compensatory damages, but no punitive damages.

After the district court announced the jury's verdict, defense counsel asked for the jury to be individually polled. Defense counsel did not, however, object under Rule 49 of the Federal Rules of Civil Procedure or raise any concerns about potential inconsistencies in the verdict before the jury was discharged.

The Defendants then renewed their motion for judgment as a matter of law and moved, in the alternative, for a new trial. The district court denied the motions. This timely appeal followed.

## II.  ANALYSIS

### A.     Claim of an inconsistent verdict

As relevant to this appeal, the jury found that (1) all three of the Defendants acted with "deliberate indifference to a risk of serious harm" to Jones, and (2) Mollo was not professionally negligent in his treatment of Jones prior to 5:00 a.m. on April 27, 2018. The Defendants now contend that judgment as a matter of law (or a new trial) is warranted because the jury's no-professional-negligence finding is allegedly inconsistent with its deliberate-indifference finding. But because defense counsel did not lodge a timely objection on this point pursuant to Rule 49 of the Federal Rules of Civil Procedure, the Defendants have forfeited their argument.

"Civil Rule 49(b) lists the options available to a district court when a jury returns an inconsistent verdict." *Heil v. Evanston Ins. Co.*, 690 F.3d 722, 727 (6th Cir. 2012), (citing Fed. R. Civ. P. 49(b)(2)–(4)), *abrogated on other grounds by Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018). This court has "held that a party waives its objection to an inconsistent verdict under Civil Rule 49, when it does not object before the court discharges the jury." *Id.* (citing *Radvansky v. Olmsted*, 496 F.3d 609, 618–19 (6th Cir. 2007). The Estate correctly points out that the Defendants failed to object to the verdict before the district court discharged the jury, and the Defendants do not contend otherwise.

Instead, the Defendants assert in their Reply Brief that they preserved this argument by "indirectly ma[king] an oral motion for [a] directed verdict as to any deliberate indifference claims after 5:00 a.m. on April 27, 2018." But defense counsel did not express any concerns about possible inconsistencies between the deliberate-indifference and the professional-negligence claims (or even mention the professional-negligence claims) during his oral motion. The Defendants also expressly conceded in their Reply Brief that "[t]he judgment sought was for any claims of deliberate indifference after 5:00 a.m. to be dismissed *because there could be no proximate cause* for Plaintiff's injuries after that time." (Emphasis added.).

Defense counsel's "indirect oral motion" suffices to preserve the Defendants' causation-based argument, *see* Part II.B, *infra*, but such a motion—which made no mention of any inconsistencies in the verdict—cannot cure the Defendants' failure to timely object under Rule 49. *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 538 (6th Cir. 2014) (holding that the defendants "waived their Rule 49(b) objection" when they "had the opportunity to object before the jury was discharged," but "waited until their post-trial motions to raise this issue"). The Defendants have therefore forfeited any argument that the verdict was inconsistent.

We note, by the way, that both *Heil* and *Innovation Ventures* refer to a party's failure to object under Rule 49 as "waiving" an inconsistent-verdict argument. Such an omission, however, might be better characterized as a forfeiture. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022) (noting that "[a] waiver occurs when a party intentionally abandons a known right," whereas "[a] forfeiture occurs when a party fails to timely assert a claim, even if the party does so unintentionally"). We have "refuse[d] to consider" waived arguments, but we "may consider forfeited [arguments] in civil cases in 'exceptional' circumstances or when a 'plain miscarriage of justice' would otherwise result." *Id.* at 1011–12.

Here, the Defendants do not contend in their briefs on appeal that there were exceptional circumstances in this case or that a plain miscarriage of justice would result from our refusal to consider their inconsistent-verdict argument. We therefore see no basis to excuse the Defendants' forfeiture, even if we may do so. *See id.* at 1013 (declining to consider a forfeited argument where the party "ha[s] not shown any exceptional reason for us to consider the claim"); *see also Cone v. Tessler* 800 F. App'x 405, 410 (6th Cir. 2020) (concluding that "an oversight on

the part of . . . counsel is not alone a justification for departing from our usual procedure of non-review of issues not raised below") (quoting *United States v. Means*, 133 F.3d 444, 448 (6th Cir. 1998)).

**B.        Proximate-cause claim**

The Defendants also argue that even if they were deliberately indifferent, no reasonable jury could have found that their deliberate indifference was a proximate cause of Jones's death. Although the Defendants did not waive or forfeit this argument, we find it unpersuasive on the merits.

*1.        Waiver*

As a preliminary matter, we agree that the Defendants have preserved this argument for appeal.  In his preverdict motion for judgment as a matter of law, defense counsel argued for dismissal of only two claims:  (1) the deliberate-indifference claim against Sherwood, and (2) the professional-negligence claim against Furnace for her post-5:00 a.m. conduct.  The Estate contends that the Defendants therefore waived any causation-based argument relating to the deliberate indifference of Furnace, Goetterman, and Mollo by failing to raise those grounds in their preverdict motion.  The Defendants do not dispute that defense counsel's Rule 50(a) motion did not concern causation, but they assert that defense counsel's subsequent "indirect[] . . . oral motion for [a] directed verdict as to deliberate indifference claims after 5:00 a.m. on April 27, 2018" preserved the argument.  We agree with the Defendants.

The Estate is technically correct that defense counsel requested only "a provision in the Verdict Form to provide that no deliberate indifference could occur post-5:00 a.m. on April 27, 2018," but the Estate has cited no authority for the proposition asserted in its brief that "[a]rgument regarding the Verdict Form is not and does not substitute for a Rule 50(a) motion." This court has instead recognized that a party may move for a directed verdict "either expressly or in a manner that otherwise would alert the trial court to the need to treat the issue raised as a motion for [a] directed verdict." *Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 426–27 (6th Cir. 1993).

In this case, the Estate's counsel argued to the district court that the Defendants' request for changes to the verdict form was effectively a motion for a directed verdict. That characterization was adopted by the district court in denying the Defendants' request. The Estate now contends that the Defendants should have responded to the district court's denial by asking for changes to the special-verdict form to distinguish between pre-5:00 a.m. and post-5:00 a.m. conduct. But given that defense counsel's actions "alert[ed] the trial court to the need to treat the issue raised as a motion for [a] directed verdict," *see id.*, further motions or requests were not necessary to preserve the Defendants' proximate-cause argument.

### 2.     *Merits*

This proximate-cause argument, although not waived, nevertheless fails on the merits. The Defendants point to the response of Fintel, one of the Estate's expert witnesses, to a question by defense counsel during cross-examination:

> **Q:** Do [you] agree with this statement, in your medical opinion that [Jones's] condition [became] irreversible where death was certain to occur at 5:00 a.m. in the morning?
>
> **A:** Yes. We discussed that in my deposition in terms of when his condition at the jail was irreversible.

According to the Defendants, the only reasonable conclusion in light of this testimony was that the Defendants' conduct after 5:00 a.m. on April 27, 2018 (the post-5:00 a.m. conduct) was not a proximate cause of Jones's death. The Estate points out, however, that Fintel clarified that statement and provided additional context during redirect examination:

> **Q:** And when [defense counsel] asked you if at 5:00 a.m. on the 27th you thought his—what was your response?
>
> **A:** That if he remained at the jail his likelihood of survival was less than 50 percent because he was deteriorating so rapidly.
>
> **Q:** And do you have an opinion, is it more likely than not if that percentage would change if he had been transferred to the hospital?
>
> **A:** I do have an opinion.
>
> **Q:** What is that?
>
> **A:** Had he been at the hospital the responses that I discussed would have prevented him from succumbing with that cardiac arrest. He would have received

fluids. He would have been on a telemetry monitor. He would have had his electrolytes restored to normal. It's not instantaneous. It takes a few hours. He would have been given benzodiazepines to help calm his central nervous system, all the treatments we talked about and he would not have died.

The Defendants contend that the jury should have credited Fintel's answer on cross-examination more than (or instead of) his explanation on redirect examination, but that is no basis to grant judgment as a matter of law. *See Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) ("The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury." (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130–31 (6th Cir. 1997))). When viewed in the light most favorable to Jones, Fintel's more in-depth explanation on redirect examination could have reasonably carried more weight with the jury than his answer to a single question on cross-examination. The jury could therefore have concluded that (1) Jones would not have died if he had been transferred to the hospital at 5:00 a.m. on April 27, and (2) by "irreversible," Fintel meant that Jones's likelihood of survival at the Jail was less than 50 percent.

### a.      Nurse Furnace

Based on Fintel's testimony that Jones would have survived if he had been at the hospital, the jury could have reasonably concluded that the decision not to transfer Jones to the hospital was a proximate cause of his death. Although Furnace did not share Jones's "medical administration record" with Sherwood, the Defendants contend that because Sherwood agreed with Furnace's decision to transfer Jones to the jail infirmary rather than to the hospital, no reasonable jury would have found that Furnace's actions were a proximate cause of Jones's death while Sherwood's actions were not.

In other words, the Defendants are arguing that the jury's verdict against Furnace is inconsistent with its verdict in favor of Sherwood. Any inconsistent-verdict claim, however, is beyond the scope of our review for the same reasons discussed previously. *See* Part II.A., *supra*.

### b.      *Nurses Goetterman and Mollo*

As for Goetterman and Mollo, the Defendants contend that there was insufficient evidence of proximate cause because Jones's death "was already certain" by the time he was placed under Goetterman's and Mollo's care in the prison infirmary.  A reasonable jury, however, could have concluded otherwise.

More specifically, the jury could have reasonably found that Jones's death was not "already certain" by the time he was transferred to the infirmary.  Fintel testified on redirect examination that by "irreversible," he meant that "if [Jones] remained at the jail[,] his likelihood of survival was less than 50 percent because he was deteriorating so rapidly."  The jury could have credited this statement and concluded that Jones's likelihood of survival was between 0 and 50 percent once he was moved to the infirmary.  And if the jury believed that Jones had, say, a 25 percent (or even a 5 or 10 percent) chance of survival, then it reasonably could have found that Jones's death was not "already certain."

The district court also correctly noted that, for constitutional deliberate-indifference claims, a plaintiff needs to establish "only that his risk [of injury] had increased due to the deprivation [of medical care]."  *See Hill v. Marshall*, 962 F.2d 1209, 1214 (6th Cir. 1992) (holding that the plaintiff "did not have to show a more than 50% risk of developing active tuberculosis"); *see also Walker v. Martins*, 27 F. App'x 401, 406 (6th Cir. 2001) (noting that a plaintiff "need only show that Defendants' failure to provide him with his prescribed [medication] increased his risk of developing a blood clot" and "was not required to come forward with evidence to show that the lack of [medication] was the cause for [his] tangible injury").  It then concluded that "[e]ven if Jones's likelihood of survival was less than 50 percent, Defendants' failure to treat him could have played a 'substantial part' in his death by significantly decreasing the likelihood that he would survive."  *Jones*, 2023 WL 5444283, at *7.

There was sufficient evidence presented at trial to support this conclusion.  When asked "how long the brain can go without oxygen" once an individual is in cardiac arrest, Fintel testified that "[t]here's the rule of 10s that for every one minute[,] the chance of brain survival falls by 10 percent, so roughly by 10 minutes of no circulation there is substantial irreversible

damage to the brain due to the cessation of oxygen delivery." The record indicates that (1) Goetterman and Mollo did not do anything for at least four minutes after they found that Jones was slumped over and in cardiac arrest, even though Jones was supposed to be in "close observation or one-to-one observation;" and (2) when Goetterman and Mollo eventually got around to giving Jones CPR, they failed to give him rescue breaths or oxygen for at least seven minutes. As a result, the jury could have reasonably concluded that, based on Fintel's "Rule of 10s," Goetterman's and Mollo's failure to provide Jones with any oxygen until eleven minutes after his cardiac arrest was at least a proximate cause (if not the direct cause) of Jones's death because of the "substantial irreversible damage" to his brain.

## C.　　Alleged attorney misconduct

As an alternative to their inconsistent-verdict and proximate-cause arguments, the Defendants contend that either judgment as a matter of law or a new trial is warranted because one of Jones's attorneys became emotional during a 15-minute examination of one of the Estate's witnesses. We disagree.

### 1.　　*Standard of review*

The district court correctly noted that, in moving under Rule 50(b) for judgment as a matter of law on this basis, the Defendants were effectively seeking dismissal of the Estate's deliberate-indifference claims as a sanction for the alleged misconduct by its counsel. We review a district court's dismissal (or refusal to dismiss) a claim for alleged attorney misconduct under the abuse-of-discretion standard. *Carpenter v. City of Flint*, 723 F.3d 700, 703–04 (6th Cir. 2013). Dismissal "is a harsh sanction which the court should order only in extreme situations showing a clear record of contumacious conduct by the plaintiff." *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005) (cleaned up) (quoting *Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614-15 (6th Cir. 1998)). "Contumacious conduct refers to behavior that is 'perverse in resisting authority' and 'stubbornly disobedient.'" *Carpenter*, 723 F.3d at 704–05 (cleaned up). The conduct "must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [the] conduct on those proceedings" to warrant dismissal as a sanction. *Id.* at 705.

Similarly, "[m]isconduct by an attorney that results in prejudice may serve as a basis for a new trial," but "[t]he burden of showing prejudice rests with the party seeking the new trial, and district courts have broad discretion in deciding whether to grant a motion for a new trial." *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 759 (6th Cir. 2004) (quoting *In re Air Crash Disaster*, 86 F.3d 498, 524 (6th Cir. 1996)). "A reviewing court must determine whether there is a reasonable probability that the verdict of a jury has been influenced by improper conduct." *Maday v. Pub. Librs. of Saginaw*, 480 F.3d 815, 819 (6th Cir. 2007) (cleaned up). In doing so, a court "must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the [alleged misconduct], [its] frequency, [its] possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case . . . , and the verdict itself." *Id.*

### 2.    *Analysis*

In denying the Defendants' motions for judgment as a matter of law or a new trial on this basis, the district court noted that one of the Estate's attorneys "appeared to cry in front of the jury while questioning Jones's brother on the witness stand" and "repeatedly sniffed and wiped her eyes throughout his testimony, which lasted for fifteen minutes." *Jones*, 2023 WL 5444283, at *2. Defense counsel did not object to this conduct at the time that it occurred. Instead, the district court reprimanded the Estate's attorney during a sidebar conference. Defense counsel later sought a limiting instruction to "disregard the crying of counsel," a request that the district court denied.

The Defendants now contend that crying is such a "highly emotional display of grief and sorrow" that even 15 minutes—out of a 12-day trial—was enough to constitute "contumacious conduct" that influenced the jury's verdict. But the district court considered this argument and found it unpersuasive, concluding that (1) the conduct of the Estate's counsel was "inappropriate" but not "contumacious" because it was "not stubbornly disobedient or persistent," and (2) there was no "reasonable probability that the attorney's misconduct influenced the verdict" when the "display of sympathy was brief and was limited to one witness" because the court instructed the jury to not let bias or sympathy influence its verdict.

The Defendants never explain why these conclusions constitute an abuse of the district court's discretion. Nor do they provide any legal authority holding that an attorney's display of emotion, even if improper, is enough by itself to warrant dismissal or a new trial. Rather, the only case cited by the Defendants that addressed crying by an attorney, *Williams v. Campbell*, No. 2:15-cv-12914, 2016 WL 6873391 (E.D. Mich. Nov. 22, 2016), concluded that there was no improper influence where the facts would likely have prompted sympathy in any event and the jurors were instructed not to let sympathy influence their decision. *Id.* at *21.

This court has recognized that "[t]he trial court is in a far better position to measure the effect of an improper question on the jury than an appellate court[,] which reviews only the cold record." *See Balsley v. LFP, Inc.*, 691 F.3d 747, 762 (6th Cir. 2012) (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)). Such deference is particularly appropriate when the alleged misconduct consists of nonverbal actions, such as crying and sniffling, that are not reflected in the record on appeal. The district court noticed the crying, instructed the Estate's counsel to stop at the first opportunity, and declined to bring more attention to it through a special jury instruction. All of these actions were well within its discretion. For these reasons, we deny the motion for judgment as a matter of law or a new trial on the basis of attorney misconduct.

## D.     Alleged juror misconduct

Finally, the Defendants contend that they are entitled to a new trial because Juror #108 did not disclose during voir dire a 2001 arrest and presumed conviction. The district court rejected this argument, and it did not err in doing so.

### 1.     *Standard of review*

We review a district court's decision to deny a motion for a new trial based on an allegation of juror misconduct under the abuse-of-discretion standard. *Zerka v. Green*, 49 F.3d 1181, 1184 (6th Cir. 1995). The Supreme Court has cautioned against "wip[ing] the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). As a result, a juror's

concealment of information warrants a new trial only if (1) the juror deliberately conceals material information on *voir dire* and the movant shows that, had the juror answered correctly, "the response would have provided a valid basis for a challenge for cause," or (2) the juror concealed information in a non-deliberate fashion, through an "honest, though mistaken, response," and the movant demonstrates actual bias. *Zerka*, 49 F.3d at 1185, 1186 n.7 (quoting *McDonough*, 464 U.S. at 556 (emphasis omitted)).

### 2.    *Analysis*

In denying the Defendants' motion for a new trial, the district court concluded that Juror #108 did not conceal any information because he was never asked about his criminal history during voir dire. The Defendants concede that none of the jurors were directly asked about their *own* convictions or periods of incarceration. They instead contend that Juror #108 should have volunteered information about his criminal history when defense counsel asked whether any jurors had *family members* who have been incarcerated or arrested and "maybe put in jail overnight or something like that?"

But none of the caselaw cited by the Defendants stands for the proposition that jurors conceal information—whether intentionally or not—when they fail to answer a question which they were never asked. Nor does the record support the Defendants' contention that any reasonable juror would have interpreted a question about family members' incarceration as implicitly asking about that juror's own criminal history. When posing the question to the jury, defense counsel expressly stated that he was referring to "a close family member" and that "[w]e don't have to go to fifth cousins and sixth cousins that may have been incarcerated." The only juror who answered "yes" to that question explained that his nephew has been in prison for a long time, and none of the jurors volunteered information about their own backgrounds in response. Juror #108 therefore could have reasonably believed that defense counsel's question was focused solely on his family members. This court has declined to order a new trial when an innocent explanation for a juror's conduct was "eminently plausible" and when "[t]he defendants have pointed to nothing . . . that contradicts this point." *Solorio*, 337 F.3d at 596.

Defense counsel, moreover, could have easily asked the jurors about their own criminal histories but did not do so. And when defense counsel had the opportunity to question Juror #108 in particular, counsel did not ask a single question. As a result, to the extent that counsel "lacked an item of information," this was information "which objectively he should have obtained"—and had multiple opportunities to obtain—"from a juror on *voir dire* examination." *See McDonough*, 464 U.S. at 555. Such a failure by the moving party is not a proper basis for granting a new trial. *Id.* at 556 The district court therefore did not abuse its discretion in denying the Defendants' motion.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.