NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0094n.06

No. 25-5399

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 20, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| PERFETTI VAN MELLE USA, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| DEMATIC CORP., | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

Before: MOORE, CLAY, and WHITE, Circuit Judges.

WHITE, J., delivered the opinion of the court in which MOORE, J., concurred. CLAY, J. (pp. 19–23), delivered a separate opinion concurring in part and dissenting in part.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Perfetti Van Melle USA, Inc. ("PvM") appeals the dismissal of its claims against Defendant-Appellee Dematic Corp. ("Dematic") based on a release executed by the parties. Because we conclude that it is unclear whether the release covers certain of PvM's claims, we REVERSE and REMAND.

**I. Facts**

In October 2018, PvM, which manufactures and distributes confectionary and chewing gum, contracted with Dematic, an engineering firm, for Dematic to design and install a custom Mass Put Module (the "Module") in PvM's warehouse to build, process, and move pallets more effectively. The contract governing the relationship (the "Contract"), labeled Proposal 140501, specified a payment and installation schedule, warranty provisions, the process and significance

of final acceptance, and the effect of subsequent change orders. The Contract is governed by Kentucky law.

Under the Contract, PvM was to pay Dematic $1,798,324.00 in installments tied to specific progress points and particular milestones, with completion intended for June 2019.[1] The final payment, a ten-percent retainer, was due thirty days after final acceptance of the Module. "Final Acceptance," as defined in the Contract, occurs when Dematic completes its work and both physical and functional testing has been conducted to PvM's satisfaction.[2] R. 1-1, PID 58. In addition to triggering the final payment, Final Acceptance modifies the rights and remedies available to PvM. "Prior to Acceptance," PvM retains broad remedies, including the right to declare a default and, if not timely cured, to "terminate the Agreement" and pay Dematic only the reasonable value of the goods and services so far provided. *Id*. at PID 92–93. "After Acceptance," however, PvM's "sole and exclusive remedies" for claims "related to the Agreement or the Goods or Services" are those set forth in the Contract's warranty provision. *Id*. at PID 93.

Pursuant to the warranty, "on the date of the start of the [w]arranty [p]eriod," goods are to be delivered "free from defects in material and workmanship" and services are to be "performed in a professional and workmanlike manner." *Id*. at PID 91.[3] Failure to conform to these standards constitutes a warranty defect. The warranty period is measured from the "invoice date of the retainer fee" and, therefore, follows the date of Final Acceptance. *Id*. If a warranty defect occurs

---

[1] After the Contract was executed, the parties agreed to changes that increased the total price to $2,026,807.10. PvM alleges that it has paid Dematic $2,030,067.47.

[2] Physical Acceptance Testing includes a "walk-through" of the Module by both PvM and Dematic personnel to "verify that the physical equipment is complete and installed per the final drawings and specifications." R. 1-1, PID 56. Functional Acceptance Testing entails various operational tests to "verify proper function of the [Module] in accordance with the requirements defined in th[e] [Agreement] . . ." *Id.* at PID 57.

[3] The parties initially contracted for a one-year warranty period but added a second-year.

during this period, Dematic must repair or replace the defective goods or re-perform services not properly performed. If Dematic fails to do so, PvM may rely on a third-party and hold Dematic liable for related costs.

The Contract additionally provides that the parties "may agree at any time prior to final payment" to "make additions, deletions, or other revisions by Change Order . . . without invalidating the Agreement." *Id*. at PID 92. "Unless expressly modified by a Change Order" the Contract's provisions "will govern all work performed under such Change Order." *Id*.

PvM alleges that after the Contract was executed and Dematic invoiced PvM for the initial down payment, the Module project experienced significant delays that "continued well past 2019" due to Dematic's non-performance and the COVID-19 pandemic. *Id*. at PID 10. In January 2020, and although the Module's installation was not yet complete and Final Acceptance had not yet occurred, Dematic invoiced PvM for the ten-percent retainer. The parties continued to address installation problems and disputed charges through October 2021.

At that point, Dematic suggested that the parties resolve their issues through a proposed Change Order dated October 17, 2021. That document is titled "Agreement" in bold, with the words "Change Order" directly below in a smaller font and normal typeface. *Id.* at PID 120. The blank space for "Agreement No." is filled in with "140501" and the "Change Order No." blank space is filled with "4." *Id.* The document then states that "[t]he following change(s) are to be made to the Agreement identified above: Change Order 4 – Reduce Contract value:" *Id.* Several invoices are then identified as well as charge reductions related to items in dispute, including a "[w]arranty TO ['turnover']," "[f]reight," and "[e]lectrical [p]ower drops and [f]loor shims." *Id.* In total, the Change Order deducted $165,988.42 from the total contract price and listed the new "Revised Agreement Total" as $1,860,818.68. *Id.*

Directly following the table listing the specific billing adjustments, the document states:

> In full consideration for the deduct amounts stated on this Order, the Parties agree: (1) Final Acceptance of the System was achieved on February 17, 2020, and (2) Each Party, on behalf of itself and its affiliated companies, hereby irrevocably and unconditionally release, acquit, and forever discharges the other Party and its affiliated, companies, successors, and assigns from any and all known and unknown, foreseen and unforeseen, past or present claims, counterclaims, cross-claims, third-party claims, obligations, liabilities, damages, rights, losses, expenses (including attorneys' fees), costs, and/or causes of action of every kind or nature arising from or relating in any way to the Agreement.

*Id*. (release provision hereafter referred to as the "Release"). PvM executed the document on December 15, 2021, triggering its obligation to pay the ten-percent retainer. With acceptance achieved on February 17, 2020, the warranty was set to end on February 17, 2022.[4]

Notwithstanding the Change Order, the Module's performance and safety issues continued. PvM identified several significant failures that it brought to Dematic's attention "throughout 2021 and into early 2022." *Id*. at PID 11. And although the parties met in early 2022 to work towards a resolution, by late summer 2022, Dematic stopped responding to PvM.

## II. Procedural History

In 2024, PvM brought this action against Dematic in Kentucky state court, alleging breach of warranty, unjust enrichment, and fraudulent misrepresentation. PvM's complaint attached the Contract and the Change Order. Dematic removed the case to federal court and then moved to dismiss under Rule 12(b)(6) on various grounds, including that PvM's claims were barred by the

---

[4] Dematic argues that the two-year warranty ran from the date it invoiced PvM for the retainer in January 2020. However, the district court concluded that, because the parties agreed to a Final Acceptance date of February 17, 2020, the warranty period ran for two years from that date. We agree with the February date.

Release in the Change Order. In response, PvM argued that dismissal on the pleadings based on a release is improper and that the Release is ambiguous.

The district court granted Dematic's motion to dismiss, finding that the Release is unambiguous, "the scope of the valid and enforceable [R]elease" encompassed all of PvM's claims, and, emphasizing that the Release covers claims "of every kind or nature arising from or relating in any way to the Agreement," that "[i]t is difficult to imagine language that would be broader than what is included in the Change Order." R. 14, PID 203–04. The district court's conclusion was also premised on its finding that PvM had raised "no contract defenses to the validity of the Change Order." *Id.* at PID 203. PvM moved for reconsideration or, in the alternative, for leave to amend its complaint to plead additional facts relating to party intent and ambiguity in the release terms, as well as to assert certain contract defenses. The district court denied PvM's motions, stating that the Release "was unambiguous, sufficiently broad, supported by valuable consideration, executed by two sophisticated market participants," and favored by strong public policy. R. 21, PID 386. This appeal followed.

### III. Analysis

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Shuler v. Garrett*, 743 F.3d 170, 172 (6th Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019) (quoting *Courtright v.*

*City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)). Our analysis focuses on "the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Meyers v. Cincinnati Bd. Of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020) (internal quotation marks omitted). We review the denial of a Rule 59(e) motion for abuse of discretion. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010).

PvM argues that the district court erred by: (1) improperly dismissing its complaint based on Dematic's affirmative defense of release and improperly penalizing PvM for failing to plead contract defenses; (2) concluding that the Release is unambiguous; and (3) denying PvM leave to amend post-judgment. PvM's first two challenges boil down to the question whether the pleadings conclusively establish that the Release legally defeats all PvM's claims as a matter of law. To make this determination, we must evaluate the Release's text and determine its scope. *Marsh v. Genentech, Inc.,* 693 F.3d 546, 554–55 (6th Cir. 2012).

**A.**

"Courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings." *Estate of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013) (quoting *Pfeil v. State St., Bank & Tr. Co.*, 671 F.3d 585, 599 (6th Cir. 2012)). And "[a] complaint need not plead factual allegations to plausibly avoid an affirmative defense." *VCST Int'l B.V. v. BorgWarner Noblesville, LLC*, 142 F.4th 393, 399 (6th Cir. 2025) (citing *Jones v. Bock*, 549 U.S. 199, 211–15 (2007)). However, we have consistently found that "[t]here is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009); *see also VCST Int'l B.V.*, 142

F.4th at 400 ("[C]ourts [can] grant a motion to dismiss based on an affirmative defense if the complaint's allegations (or any other documents that we may consider at this stage) show as a matter of law that the defense applies"); *Marsh*, 693 F.3d at 555 (affirming dismissal based on affirmative defense where the plaintiff anticipated the defense and the plaintiff's "own allegations show that a defense exists that legally defeats the claim for relief") (internal quotation marks omitted).

Because PvM's complaint attached the Change Order containing the relevant Release language, the district court did not err in addressing Dematic's asserted affirmative defense at the motion to dismiss stage even though the complaint did not explicitly discuss the Release. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

**B.**

Under Kentucky law, "[a] valid and enforceable release operates as a *complete bar* to a later action regarding any claim encompassed within the release." *Coffman v. AT&T, Corp.*, 678 F. Supp. 3d 880, 885 (E.D. Ky. 2023) (internal citations omitted) (emphasis in original). Releases are contracts governed by the basic principles of contract law. *See Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. Ct. App. 2006). "The construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000). In construing a contract, the court's primary object "is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). If the contract is unambiguous, courts "look only as far as the four corners of the document to determine [that] intent[]," *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*,

174 S.W.3d 440, 448 (Ky. 2005), and enforce the contract "strictly according to its terms" interpreted according to their ordinary meaning and without evaluation of extrinsic evidence, *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (internal quotation marks omitted). A contract is ambiguous if "a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell*, 94 S.W.3d at 385. When a contract is ambiguous, "areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." *Id.*; *see also Frear*, 103 S.W.3d at 106.

PvM first argues that the Release's language is ambiguous because it is unclear whether it applies to "claims, defects, or breaches that may have manifested or accrued" after the Change Order's execution and, more broadly, because releases do not cover after-arising claims. Reply Br. at 11; *see also* Appellant's Br. at 28–33. As a threshold matter, Dematic asserts that we should reject these arguments as waived because PvM presented them to the district court for the first time in its post-judgment motion for reconsideration. PvM counters that its prior briefing "plainly identified the temporal scope of the release as a source of ambiguity." Reply Br. at 12. Because we understand Dematic's argument to be that PvM failed to timely assert, rather than affirmatively waived, its argument, this is a question of forfeiture. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022). Regardless, and although not a model of clarity, PvM's prior briefing sufficiently argued that the Release should not be read to unambiguously cover future claims.

To support that its argument was properly preserved, PvM cites its argument at the motion to dismiss stage that the Release covered only "certain claims leading up to Change Order 4 (and the date of the Final Acceptance)," that the parties released "those claims that they could have brought before Final Acceptance," and that part of the bargained-for consideration between the

parties was "a release of pre-acceptance claims" only. Reply Br. at 12 (quoting R. 8, PID 159–60) (original emphasis omitted). PvM argued that the Change Order was negotiated to bring certainty to charges then in dispute in exchange for a reduced price and an agreement on the date of Final Acceptance. *See* R. 8, PID 159 ("PvM agreed to Final Acceptance of the [Module] and the Parties agreed to a release of certain claims leading up to Change Order 4"); *id.* at PID 160 ("The 'benefit' to Dematic in executing Change Order 4 is found in the Final Acceptance and accompanying release of pre-acceptance claims."). According to PvM, the Release, therefore, only encompassed claims the parties were disputing at the time and was not intended to include warranty obligations. *See id.* at PID 157–58 ("[N]othing in the plain text of [the Change Order] states that, by virtue of Change Order 4, PvM has renounced or otherwise agreed to forgo its warranty rights under the 2018 Contract.").

To be sure, PvM's argument below about future claims was intertwined with its argument that the Release was not intended to release its warranty rights and did not highlight the use of the term "past or present" in the Release. But we read PvM's assertion that the Release covered only "certain claims leading up to Change Order 4" to express *both* that the Release applied only to non-warranty claims *and* that it applied only to past or present claims that existed at the time of the Change Order, and therefore omitted future or after-arising claims. *Id.* at PID 159. Dematic appears to have anticipated the same. It emphasized in its motion to dismiss that "PvM may argue that the release does not apply to Dematic's post-contractual warranty support obligations" and asserted that this argument was faulty in part because "PvM allege[d] only defects that were well-known before the Change Order was signed." R. 7, PID 143. And in its reply, Dematic dismissed PvM's suggestion that the Release applies to only "certain claims leading up to [the] Change Order" and argued instead that the Release's broad phrasing encompasses "any and all" claims

without limitation. R. 10, PID 173–74. The district court additionally recognized PvM's arguments as implicitly involving future claims, stating that PvM's position was "that the ambiguous release only encompassed certain claims the parties were disputing at the time." R. 14, PID 202.[5] This is enough to preserve the issue for our review.

**C.**

We now turn to the substance of the arguments. Contrary to what PvM asserts, Kentucky law permits the release of future claims where clearly contemplated by the release's language. *See e.g.*, *Stavens v. Stikovac*, 2018 WL 5778808, at *6 (Ky Ct. App. Nov. 2, 2018) (enforcing release of "any and all claims, causes of action, potential claims and potential causes of action . . . which are not existing or that might arise in the future"); *Gibson Co. Real Estate, Inc. v. Garrett, LLC*, 2013 WL 4710325, at *1–5 (Ky. Ct. App. Aug. 30, 2013) (enforcing release covering "all past, present and future obligations that might arise").

To determine whether the Release encompasses after-arising or future claims, we begin "with an examination of the plain language." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). The Release expressly "unconditionally" and "forever discharges" the parties from "any and all known and unknown, foreseen and unforeseen, past or present" claims "arising from or related in any way to the Agreement." R. 1-1, PID 120. PvM

---

[5] Dematic explicitly acknowledged its anticipation of PvM's "after-arising" argument in response to PvM's Rule 59 motion, where PvM argued that the Release was ambiguous as to whether it precludes "after-arising claims such as PvM's claims here." R. 16, PID 207. In response, Dematic asserted that this argument was waived but that it had "[n]onetheless . . . anticipated and addressed [this] argument" in its motion to dismiss "arguing . . . that such an interpretation was unreasonable and would deprive Dematic of the only benefit it received in exchange for the $165,000 payment discount." R. 19, PID 359. Dematic went on to argue "[t]he [c]ourt considered PvM's arguments to the contrary and found that the Release language was not compatible with this interpretation." *Id.*

argues that the omission of the word "future" renders the Release ambiguous as to those claims arising after the Change Order's execution. Appellant's Br. at 30–31. Dematic counters that the language "known and unknown" and "foreseen and unforeseen" clearly extends the Release to future claims. Appellee's Br. at 26–27.

The Release plainly omits reference to after-arising claims. To be sure, the Release's language is generally broad, but it limits the released claims to those "past or present." R. 1-1, PID 120. And we are unconvinced by Dematic's proposed workaround that the use of "foreseen and unforeseen" plugs this hole; we are aware of no cases decided under Kentucky law that interpret "foreseen or unforeseen" as the equivalent of "future."[6] We give words their "ordinarily used meaning unless the context requires otherwise," *Bays v. Mahan*, 362 S.W.2d 732, 733 (Ky. 1962), and we read "foreseen and unforeseen" here to cover past or present claims arising from known or unknown defects whether or not they were anticipated by the parties on the date the Change Order was executed. Dematic's reliance on *Howard v. Spradlin*, 562 S.W.3d 281 (Ky. Ct. App. 2018) is unhelpful. *See* Appellee's Br. at 26–27. That case concerned the definition of "foreseeability" in the tort context, which concerns broad societal interests rather than the parties' intent and the words chosen. *Howard*, 562 S.W.3d at 286. And the Release's use of "foreseen and unforeseen" rather than "foreseeable" is consistent with its reference to "past or present" claims.

Dematic contends that, because the Release is a "specific release" related to a specific contract—rather than a "general release" that "foreclose[s] any claim between the parties existing as of the date of the release" without reference to any contract, event, or transaction—its coverage

---

[6] We also find no support for Dematic's assertion that the Release's application to "known and unknown" claims indicates that it covers future claims. We read "known and unknown" to refer to claims the parties were or were not aware of when executing the Contract.

is not limited to existing claims. Appellee's Br. at 28–29. Although we agree with Dematic's characterization of the Release as specific, that characterization alone does not overcome its text. The cases on which Dematic relies either involve specific releases that explicitly include future or after-arising claims, *see 3D Enters. Contracting Corp.*, 174 S.W.3d at 448–49 (involving release waiving "all possible, potential, or actual claims . . . which do[] or may result from any factual or legal assertion that arises or might arise from the lawsuit"); *Luttrell v. Cooper Indus., Inc.*, 60 F. Supp. 2d 629, 632 (E.D. Ky. 1998) (releasing "any and all claims . . . of every type or kind, known and unknown, which the undersigned had, have now, or may have in the future"), or discuss similarly inapposite specific releases, *see Sherman v. Am. Water Heater Co., Inc.*, 50 S.W.3d 455, 458–59 (Tenn. Ct. App. 2001) (finding general release that waived "all claims [the] Employee has or may have against the Company as of the date this Agreement is signed by Employee" did not bar future claims and distinguishing a case that involved a specific release that covered claims "arising out of or in connection with" the relevant work and discharged the defendant "from all liabilities therefor" as encompassing future claims in part because it "did not contain any temporal limitation" limiting it to claims "as of the date of the Release"). Regardless of the type of release, our analysis must focus on the contractual language. And given the Release's language, it does not capture after-arising or future claims.[7]

---

[7] We decline to adopt PvM's position that the Release exclusively covers pre-Final Acceptance claims. *See, e.g.*, Appellant's Br. at 31 (describing how the Change Order "expressly ties the [R]elease to final acceptance"). Our finding is narrower and encompasses only post-Final Acceptance claims arising after the Change Order's execution.

We also do not embrace PvM's argument that the Release does not apply to claims that came to light after the Change Order's execution but are based on facts pre-dating the date of execution. The cases PvM cites are distinguishable and none arise under Kentucky law, which does not bar the prospective release of claims. *See, e.g.*, *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 298 (D.D.C. 2012) (declining to apply a per se rule "precluding consideration of

**D.**

Of course, that the Release does not preclude after-arising claims only matters if PvM has asserted such claims. Dematic argues that PvM's claims are not after-arising and, in fact, all predated the execution of the Change Order and Release. In its complaint, PvM brings claims for breach of warranty, unjust enrichment, and fraudulent misrepresentation, all of which relate to Dematic's alleged failure to honor its warranty obligations under the Contract. It alleges that the Module "has been a complete failure and has never properly functioned, in plain breach of Dematic's obligations," R. 1-1, PID 7, and is "so besieged by problems that it is basically unusable," *id*. at PID 10. It further states that "the parties were still addressing installation problems" with the Module and certain disputed charges when Dematic suggested the Change Order. *Id.* Such problems and defects constitute existing, not future, claims.

But PvM also alleges that it brought "significant performance and safety failures" to Dematic's attention "throughout 2021 and into early 2022" and that the parties met to work towards a resolution "[n]o later than early 2022," which encompasses a period following the Change Order's execution in December 2021 and within the warranty period. *Id.* at PID 11. To be

---

pre-settlement conduct of discrimination in a later case where the status of a current practice is at issue" in Title VII discrimination and retaliation case) (citation modified). For example, in *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.,* 648 F.3d 452, 460 (6th Cir. 2011), we interpreted a general settlement and release executed by the parties in the middle of a conspiracy under Tennessee law. We concluded that the release did not apply to a claim that accrued after the release but was based on predicate facts that occurred before because the "claim did not exist at the time of the settlement" since "conspiracies accrue each time a defendant commits an act that injures a plaintiff's business" and "Tennessee law prevents releases from operating prospectively." *Id.* (citations modified). And, although the court in *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 27 F.3d 521, 524 (11th Cir. 1994) held that a general release does not "discharge liability for injury by subsequent acts merely because those acts resulted from a previously existing scheme or conspiracy," that case was decided under Georgia law and elsewhere held that, despite this general rule, parties can expressly contract to discharge liability for already committed but unknown tortious conduct.

sure, PvM's complaint does not expressly state when each defect and claim arose. However, "constru[ing] the complaint in a light most favorable to [PvM], accept[ing] all plausible well-pled factual allegations as true, and draw[ing] all reasonable inferences in [its] favor," it is plausible that some portion of PvM's claims relate to breaches that occurred after the Change Order was executed. *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013).

Because the Release's plain language does not bar future claims and the complaint on its face does not plainly indicate that the asserted claims all arose prior to the date of execution, it was error for the district court to dismiss the complaint at this stage in the litigation. *VCST Int'l B.V.*, 142 F.4th at 402 (finding dismissal based on affirmative defense improper because "[a]t this stage, then, we cannot say that [defendant] has established that the [contract's terms] apply as a matter of law") (citation omitted). Dematic may well establish its release-of-claims affirmative defense, but it will require a factual record beyond the pleadings. *See Pfeil*, 671 F.3d at 599 n.4 (declining to grant motion to dismiss based on an affirmative defense absent supporting facts "even if the result [only] delay[s] the inevitable") (citation omitted).

The dissent agrees that after-arising claims are not captured by the Release but contends that none of PvM's claims are after-arising. In support, the dissent points to the Kentucky statute of limitations for a breach of contract for the sale of goods, which states that a breach of contract action "must be commenced within four (4) years after a cause of action has accrued," that "[a] cause of action accrues when the breach occurs," and that "[a] breach of warranty occurs when tender of delivery is made." Ky. Rev. Stat. Ann. § 355.2-725(1)–(2). But this statute is Kentucky's "adoption of section 2-275 of the Uniform Commercial Code" and is typically invoked when parties dispute whether an action was filed outside the prescribed four-year period. *Barnes v. Cmty. Tr. Bank*, 121 S.W.3d 520, 521 (Ky. Ct. App. 2003). Neither party has raised this statute

before us or at any point in the litigation, and its application, if any, to the issues in this case should be addressed by the parties and the district court in the first instance.

PvM asserts two additional ambiguities in the Release. First, PvM contends that the Release is ambiguous regarding whether the parties intended to release Dematic from its "ongoing warranty obligations" because it does not use the word "warranty." Appellant's Br. at 33. According to PvM, only "express[] modification by a Change Order" alters the rights and obligations under the Contract. *Id.* at 33–34. Therefore, because the Change Order did not expressly state that warranty obligations were released, PvM argues they should continue in force. We are not persuaded.

The Release's broad language encompassing "any and all . . . claims, counterclaims, cross-claims, third-party claims, obligations, liabilities, damages, rights, losses, expenses[,] costs, and/or causes of action of every kind or nature arising from or relating in any way to the Agreement" clearly covers warranty claims. R. 1-1, PID 120. The Release does not distinguish between types of liability arising from different claims and related breaches. Rather, it expansively covers all types of claims, including those, like warranties, that are obligations arising from the Contract. Requiring the Release to list every type of claim it intends to release, as PvM urges, would render its use of "any and all" meaningless. Nor does the inclusion of this broad Release language run afoul of the Contract's provision that a Change Order will not alter the obligations and rights under the Contract without an "express[] modifi[cation]" of the provisions. *See id.* at PID 92. The Release does what the clause permits—it expressly alters the parties' relationship under the Contract, and we see nothing in the Contract that prohibits broad, but express, modifications. We also cannot identify any other limitations that would carve out warranty obligations from "any and all" claims covered by the Release. *See Butt v. Independence Club Venture, Ltd.*, 453 S.W.3d 189,

195 (Ky. Ct. App. 2014) (finding "no limiting language in the release" which covered "any and all claims").

However, because the Release does not preclude after-arising claims, it does not unambiguously preclude after-arising warranty claims. Therefore, although the Release forecloses warranty claims arising from the period between February 2020—when the parties agreed Final Acceptance occurred—and December 2021—when the parties executed the Change Order, it does not on its face release warranty claims that arose following the Change Order's execution through the end of the warranty period in February 2022.

Finally, PvM argues that the Change Order is ambiguous regarding its release of all claims "arising from or relating in any way to the Agreement" because "Agreement" is nowhere defined and the Change Order itself is entitled "Agreement." Appellant's Br. at 35–36 (quoting R. 1-1, PID 120). We discern no such ambiguity. The Change Order plainly states that the agreed-upon deductions apply to "the Agreement identified above," which is "Agreement No. 140501" or the Contract. R. 1-1, PID 120. Further, the document consistently refers to itself as the "Change Order" or "Order" while its references to the Contract always include the term "the Agreement." *Id*. Indeed, the Release language itself distinguishes between the two, providing that "[i]n full consideration for the deduct amounts stated ***on this Order***, the Parties agree" to release claims "arising from or relating in any way to ***the Agreement***." *Id*. (emphasis added). Adopting PvM's argument would therefore have us improperly conflate terms clearly distinguished by the Change Order's plain language.

PvM points to the Change Order's one-time identification of the Contract as the "Original Agreement" as further evidence of ambiguity. But that term is used only to distinguish between the price the parties originally agreed to compared with the "Revised Agreement Total" following

"[t]his Change Order." *Id.* The Change Order is therefore consistent in its use of terms, varying them only to provide further precision. PvM further argues that the Change Order's title (reproduced below) supports a finding of ambiguity regarding the agreement to which the Release applies.

**Agreement**
Change Order

*Id.* To be sure, the Change Order's title suggests a possible ambiguity. However, the document as a whole makes clear that "the Agreement" to which the release provisions apply is the Contract, not the Change Order. The Change Order uses the term "Order" to refer to itself and uses variations of the term "the Agreement" to refer to the Contract. *See id.* (noting that "[t]he following change[s] are to be made to the Agreement identified above" which is "Agreement No. 140501" and opening the Release with "[i]n full consideration for the deduct amounts stated on this Order"). Because the only reasonable interpretation of "Agreement" is that it means the Contract, the district court did not err in finding that language unambiguous.

## IV. Conclusion

In sum, the district court erred in dismissing the complaint because the complaint does not definitively show that the Release covers all PvM's claims. From its plain language, the Release does not preclude future claims. And, because the case is at the motion to dismiss stage, the record does not include sufficient information to allow us to ascertain the nature and timing of the asserted failures giving rise to PvM's claims.

For the reasons set out above, we REVERSE and REMAND to the district court for additional proceedings consistent with this opinion.[8]

---

[8] Because we reverse the dismissal of PvM's complaint, we do not address PvM's argument that the district court improperly denied its Rule 59 motion for reconsideration or for leave to amend.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** Plaintiff Perfetti Van Melle USA, Inc. and Defendant Dematic Corp. signed a release agreement which resolved all existing claims arising from Defendant's installation of the Mass Put at Plaintiff's facility. But the Release did not resolve any claims that occurred after the parties signed the agreement. The majority thus reverses and remands this case to the district court to determine whether Plaintiff has alleged "after-arising" or future claims. But this is unnecessary. Taking all plausible well-pled factual allegations in Plaintiff's Complaint as true and drawing all reasonable inferences in Plaintiff's favor, we can confidently conclude that Plaintiff has not or cannot allege such claims. I therefore respectfully dissent.

A claim-by-claim analysis of Plaintiff's Kentucky breach-of-warranty, unjust enrichment, or fraudulent misrepresentation claims is instructive. Under Kentucky law, "a breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Ky. Rev. Stat. Ann. § 355.2-725(2).[1] The at-issue warranty clauses are not explicitly premised on the future performance of the Mass Put, so the breach of warranty should occur at the time of delivery—in this case when the Mass Put was constructed. *See* Complaint, R. 1-1, PageID #8–9 ("Dematic warrants (the "Goods Warranty") that the Goods as set forth in the Proposal will be, on the date of the start of the Warranty Period, free from defects in material and workmanship. Dematic warrants (the "Services Warranty") that the Services (as defined below) will be performed in a professional

---

[1] The majority counters by arguing that this statute is typically raised in the context of statute of limitations defenses. Maj. Op., at 14–15. But Ky. Rev. Stat. Ann. § 355.2-725(2) is instructive because it explicitly defines when, under Kentucky law, breach occurs and when a plaintiff may bring a Kentucky breach of warranty claim.

and workmanlike manner. Services for purposes of this Section 2 means the installation and commissioning services as set forth in the Proposal."). It is not possible for any claims for breach of the Goods warranty to be after-arising; under Kentucky law, they were present from the moment the Mass Put was constructed with its defects—regardless of whether the defects were known or unknown. Change Order 4 explicitly defines when the Mass Put was completed, by stating that "Final Acceptance of the System was achieved on February 17, 2020." *Id.* at PageID #120. The Mass Put was thus completed, albeit with all its issues, on that date and any claim for such breach of the Goods Warranty should have existed as of that date. Further, Plaintiff does not allege that Defendant rendered any services to the Mass Put between December 15, 2021 and January 22, 2022, the time period following the Release's signing where the two-year warranty period was still in effect.[2] Thus, Plaintiff's breach-of-warranty claims as currently alleged are past or present claims that should be covered by the Release's language.

Plaintiff's unjust enrichment claim is likewise covered by the Release's language. Under Kentucky law, a claim of unjust enrichment requires "prov[ing] three elements: '(1) benefit conferred upon [the] defendant at [the] plantiffs [sic] expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value.'" *Furlong Dev. Co., LLC v. Georgetown-Scott Cnty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016) (quoting *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009)). "Because unjust enrichment is rooted in equity and 'law trumps equity,' [Kentucky] courts frequently note

---

[2] Arguably, the Release's language discharged Defendant from its Goods and Services warranty obligations. The Release states that the Parties "irrevocably and unconditionally release, acquit, and forever discharges the other Party . . . from any and all known, and unknown, foreseen and unforeseen, past or present . . . obligations." Complaint, R. 1-1, PageID #120. So any ambiguity as to whether any services were rendered in the time between the Release's effective date and the end of the warranty period should be moot since the warranties were known "obligations" that were discharged by the Release.

that 'unjust enrichment is unavailable when the terms of an express contract control.'" *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 778 (Ky. 2017) (first quoting *Bell v. Commonwealth*, 423 S.W.3d 742, 749 (Ky. 2014); and then quoting *Furlong Dev. Co.*, 504 S.W.3d at 40). Put differently, "[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed." *Id.* (quoting *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161 (Ky. Ct. App. 1977)).

To be sure, this observation by Kentucky courts is not a total bar to unjust enrichment where the parties performed a contract. The Kentucky Supreme Court noted that restitution which solves unjust enrichment can "occur at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations. Applied to any such circumstance, the statement that there can be no unjust enrichment in contract cases is plainly erroneous." *Superior Steel*, 540 S.W.3d at 779 (quoting Restatement (Third) of Contracts § 2, cmt. c (A.L.I. 2011)). In applying this principle, the *Superior Steel* court found unjust enrichment to be available to an unpaid subcontractor where "[c]ontractual gridlock persist[ed] and no remedy was forthcoming under the parties' contracts." *Id.* at 781–82. The court also dismissed the existence of "contract provisions regarding change order requirements and necessary applications for payment . . . as [the defendant's] excuses for non-payment" by noting that the defendant "fail[ed] to act on the requested change orders and their assurances that both [the subcontractor] and [the contractor] would be paid." *Id.*

Comparatively, this case is inapposite to *Superior Steel* where a plaintiff could recover unjust enrichment despite an existing completed contract. Plaintiff alleges that "Dematic has inequitably retained the benefits of PvM's payments without providing the corresponding goods or services." Complaint, R.1.1, PageID #12. But to the extent Defendant was unjustly enriched

by its failure to fulfill its warranty obligations, which is the theory Plaintiff proceeds on, that unjust enrichment was captured and discharged by the parties' release agreement. Plaintiff does not allege that Defendant failed to rebate them for the amount listed in Change Order 4. Nor does Plaintiff allege that they contracted with Defendant after the signing of the Release. Defendant's alleged unjust enrichment was remedied by the Release. So the instant case is unlike *Superior Steel*, where "no remedy was forthcoming under the parties' contracts." 540 S.W.3d at 781. Instead, Plaintiff had an adequate legal remedy under the contract and change orders. This makes Plaintiff's unjust enrichment claim unavailing as presently alleged in its Complaint.

Finally, Defendant's alleged fraudulent misrepresentation occurred well before the Release was signed. A Kentucky action for fraud requires that a plaintiff prove by clear and convincing evidence "a) material representation, b) which is false, c) known to be false or made recklessly, d) made with inducement to be acted upon, e) acted in reliance thereon and, f) causing injury." *Young v. Vista Homes, Inc.*, 243 S.W.3d 352, 361 (Ky. Ct. App. 2007) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). The alleged fraud in question is Defendant's representation to Plaintiff that the two-year warranty period would start when the Mass Put was completed, not before it was completed. Plaintiff then alleges that this representation became false "when Dematic prematurely and fraudulently invoiced the retainer before the installation by Dematic or acceptance by PvM of the Mass Put," which triggered the start of the warranty period by the terms of the contract. Complaint, R. 1-1, PageID #13. This was fraud, according to Plaintiff, because "Dematic either knew the statements regarding the warranty were false at the time of making them, or made the statements with reckless disregard for their truth." *Id.* This alleged misrepresentation occurred prior to the Release's signing, post the original contract's signing and when Defendant prematurely triggered the start of the warranty period by sending

Plaintiff the final invoice before the Mass Put was completed. Because the alleged fraud occurred well before the parties signed the Release, Plaintiff's fraudulent misrepresentation claim was either known or unknown to the parties at the time of the Release's signing. Accordingly, even in the light most favorable to Plaintiff, we can say as a matter of law that the Release's language applied to Plaintiff's fraudulent misrepresentation claim.

The majority contends that we should allow the parties to raise the issue of whether Plaintiff has alleged after-arising or future claims before the district court in the first instance. Maj. Op., at 17–18. But when the record is clear we need not waver by requiring *de novo* review. As the foregoing discussion demonstrates, we can comfortably conclude as a matter of law that Plaintiff did not or could not allege such claims. I would therefore affirm the district court in full. Since the majority thinks otherwise, I respectfully dissent.